# CHARLESTON.

DEWING *et al.* v. HUTTON *et al.*

Decided December 21, 1900.

1. EQUITY—*Reference to Commissioner.*
    The objection to the reference of a cause to a commissioner in chancery comes too late after the cause has been fully heard and determined by him on the merits against the objector. (p. 578).

2. Findings Sustained.

The findings of a commissioner, unless plainly shown to be against the preponderance of the evidence, will be sustained. (p. 578).

3. Party to a Controversy—*Presumption.*

When a party to a controversy fails to examine a material anu important witness in his behalf, the law raises the presumption that such witness' evidence, if given, would be adverse to such party. (p. 581).

4. Weight of Evidence—*Commissioners Finding.*

The weight and sufficiency of books of account as evidence is peculiarly a question of fact for the commissioner, and his finding with regard thereto will not be disturbed unless manifestly erroneous. (pp. 581, 582).

5. Principal and Agent—*Burdens in Whole.*

A person who employs an agent to buy up timber lands, and such agent engages the services of another for certain compensation agreed between them, cannot escape the payment of such compensation if he accepts the purchases secured thereby. If he would enjoy tne benefits, he must assume the burdens in whole, and not in part. (p. 582).

6. Benefits—*Responsibilities.*

If a person receives the benefits of the dealings of an unauthorized agent, he must also discharge all responsibilities occasioned thereby. (p. 583).

7. Deed—*Estoppel.*

If a person holding a mere contingent right therein executes a deed for personal property in favor of the real owner of such property, such deed will not estop the grantor from showing that the grantee was the true owner of such property prior to the execution of such deed, and that he was induced to make the same by such owner, who was fully acquainted with the condition of the property at the time of the execution of the deed. He will, however, be estopped from denying that whatever interest he might have had in such property passed by such deed. (p. 587).

8. Unauthorized Acts—*Responsibility.*

If an agent notifies his principal of unauthorized acts committed by himself, the principal, to escape responsibility therefor, must promptly repudiate the same before the rights of third parties are affected; otherwise, he will be estopped to deny that such acts of such agent were authorized. (p. 590).

Appeal from Circuit Court, Randolph County.

Bill by Dewing & Sons against Elihu Hutton and others. Decree for defendants, and plaintiffs appeal.

*Affirmed.*

W. T. ICE, JOHN BASSEL, W. P. HUBBARD and E. D. TAL-
BOTT, for appellants.

CAMPBELL, HOLT & CAMPBELL, L. D. STRADER, J. F. HARD-
ING and W. MOLLOHAN, for appellees.

DENT, JUDGE:

Dewing & Sons appeal from a decree of the circuit court of
Randolph County in a chancery suit wherein they were plain-
tiffs and Elihu Hutton and others were defendants.

This suit was here before with the shoe on the other foot, and
is reported in 40 W. Va. 521, where the origin of the litigation
is fully detailed, and it is not necessary to repeat it. At that
time Dewing & Sons had a decree against Hutton for the sum
of thirty-nine thousand dollars, and Hutton was dissatisfied.
This time Hutton has a decree against Dewing & Sons for nine-
ty-eight thousand sixty-four dollars and ninety-eight cents, and
the latter are not satisfied. It is claimed that this difference in
result alone is so great as to furnish evidence for impeachment
of the last conclusion. This, however, is not true in any sense,
no more than that the former verdict of a jury set aside can be
used to impeach a later verdict confirmed by the trial court. The
last verdict is conclusive of the errors of those set aside that
preceded it. And so the last commissioner's report founded on
additional evidence and a fuller and more careful examination
of the facts under the direction of this Court as to the law is
conclusive as to the erroneous character of the former finding,
and it can in no wise be impeached thereby, although the differ-
ence between them may be entirely irreconcilable. The last
report and decree in accordaance therewith must stand or fall
on merit alone without regard to any divergence therein from
any former report which has been set aside and annulled. The
rules therefore governing the consideration of this cause are the
same as though there was no other than the one commissioner's
report had therein, on exceptions to which it now comes to this
Court. The rule in such cases is that "The conclusions of a
commissioner in chancery on purely questions of fact referred
to him for ascertainment and involving the weight of conflict-
ing testimony should have every reasonable presumption in their
favor, and should not be set aside unless it plainly appears they
are not warranted by any reasonable view of the evidence."

*Haymond* v. *Camden et als.,* decided at this term. And especially is this true when the finding has been confirmed by the circuit court. *Cann* v. *Cann,* 45 W. Va. 563; *Fitzgerald* v. *Windmill Co.,* 42 W. Va. 570; *Hartman* v. *Evans,* 38 W. Va. 670; *Fry* v. *Feamster,* 36 W. Va. 454; *Rogers* v. *O'Neal,* 33 W. Va. 159; *Handy* v. *Scott,* 26 W. Va. 710; *Graham* v. *Graham,* 21 W. Va. 698; *Boyd* v. *Gunnison,* 14 W. Va. 1. These principles have been so well settled by the repeated decisions of this Court that no longer can they be controverted, and they should be continually kept in mind during the consideration of this cause, that there be no departure therefrom. And as this cause involves the doctrine of agency, there is another principle of equity which must wield peculiar potency in the determination of the various questions raised, and this is that where a principal enjoys the benefits resulting from a reputed agent's agreements, such principal cannot repudiate the agency in whole or in part without first surrendering all the benefits derived therefrom. He cannot separate and enjoy the profits and repudiate and refuse to bear the expenses and losses. If he declines the burdens with one hand, with the other he must surrender the gains. There can be no rescission in part at his instance, but the rescission must be *in toto.* As an example a principal cannot send out an agent to buy white oak timber, and when the agent buys all the timber of a certain owner on a certain tract of land, at one dollar per tree, repudiate such contract as to all the timber except the white oak, but if he accepts the contract made by the agent in part, he must accept it as a whole, otherwise the owner is entitled to a rescission, for in fixing the price of the white oak he took into consideration the sale of the residue of the timber. "A ratification in part will not be allowed, but to be effective, there must be a ratification of the whole act, for the law will not allow a principal to claim that which benefits him and repudiate the rest." 1 Am. & En. En. Law (2 Ed.) 1192, 1193, 1194, *and the numerous authorities cited in this greatest and crowning legal work of the departing century.* He who accepts a contract entered into on his behalf by an unauthorized agent assumes its burdens as well as its benefits. *Owens* v. *Boyd Land Co.,* 95 Va. 560; *N. Y. Life Ins. Co.* v. *Taliaferro, Id.* 522; *Harvey* v. *Steptoe,* 17 Grat. 303; *Crump* v. *U. S. Mining Co.,* 7 Grat. 369; Story on Agency, 239, 249; *Curry* v. *Hall,* 15 W. Va. 867; *State* v. *B. & O. R. R. Co.,* 15 W. Va. 362; *Detwiler*

*v. Green,* 1 W. Va. 109. In the present case Winchester acting as agent for plaintiffs entered into a contract with Hutton at first in writing and afterwards continued by verbal agreement and understanding to purchase certain large tracts of timber land at a certain price and fixed compensation, Winchester assisting him in doing so. Dewing & Sons cannot repudiate this arrangement between Hutton and Winchester so long as they continue to hold and enjoy the benefits thereof, and thus avoid any necessary burdens entailed thereby, but if they would escape such burdens they must forego the benefits, rescind the purchase obtained through the arrangement between Hutton and Winchester and restore the property to Hutton subject to the moneys and interest thereon invested therein by them. If they decide to retain the properties they must fully carry out the agreements made by Winchester under which they were secured. The plaintiffs' original instructions to Winchester were, "You know what we want, and how to do the business better than we do, and you may go on and do it to suit your-self, and we will be satisfied. You had better keep it secret." The latter sentence referring to the agency. Winchester obeyed this injunction to the letter, and went on and did the business to suit himself, and now the plaintiffs are not satisfied except as to benefits and seek to repudiate the responsibilities, which they could not do even though Winchester acted entirely without authority, unless they first surrendered the benefits arising therefrom. Keeping in view these general principles, this controversy determines itself.

The plaintiffs took many exceptions to the commissioner's report, and have assigned numerous grounds of error, which are so redundant in character it is wholly unnecessary to encumber this opinion with a literal transcript thereof, but all the material points raised will be fully considered.

The first objection is the vacation substitution of commissioner Wilson for commissioner Ward without notice to the plaintiffs. The plaintiffs knew of this appointment, acquiesced in it, and raised no objection thereto before the case was fully heard and determined adversely to them by this commissioner. Such a technical objection to his appointment comes too late, even had it not been afterwards ratified and confirmed by the court in term. He who fails to speak when he should will not afterwards be heard when he would, for such would be contrary

to the orderly administration of justice, and is trfling with the court. In the case of *Whipkey* v. *Nicholas*, 47 W. Va. 35, (34 S. E. 751), this Court held that "A litigant who without objection joins in the selection of a special judge to hear and determine his case will not be permitted to raise mere technical objections to the selection and qualification of such judge after he had decided against such litigant." The same rule applies to the appointment of a commissioner when made by the court either in term or vacation, if the case is fully heard and determined on the merits, a defeated litigant will not be permitted to raise mere technical objections to such appointment, but his acquiescence in such appointment will be held to waive all technicalities. As Judge Brannon says in *Hebb* v. *Cayton*, lately disposed of by this Court, agreeing to disagree, "we decide substance, not technicalities."

Plaintiffs farther object to the commissioner's report for disallowance of certain charges against Hutton in their favor amounting to the sum of six thousand eighty-two dollars and eighty-nine cents. The plaintiffs having discharged Winchester as their agent and seeking to repudiate his transactions in so far as not favorable to themselves refuse to introduce him as a witness. So that as to any matter in controversy which might have been made clear by his evidence, and with regard to which he was not called upon to testify, it must be presumed that his testimony if given would have been adverse to their pretensions. *Union Trust Co.* v. *McClellan*, 40 W. Va. 405. A litigant cannot refuse to introduce an important and competent witness as to a disputed point without enduring the legal consequences of such refusal. The plaintiffs failing to introduce Winchester, their agent who kept the account for them against Hutton, the latter was compelled to do so as to certain matters he wished to establish, and also to introduce the books kept by him as containing the account between the parties. These books when introduced were only *prima facie* evidence of the charges therein contained, and either had the right by better evidence to explain or rebut any item. Their introduction was a matter of necessity on the part of Hutton to prove items not otherwise susceptible of proof, and this does not preclude him from disproving any item concerning which there was other or more satisfactory testimony, nor did it prevent plaintiffs from introducing Winchester to sustain any such disputed item. Books

of account are not admissible as evidence of items entered therein when it appears from the testimony of the parties or the nature of the transaction that more satisfactory evidence exists. 9 Am. & En. En. Law (2 Ed.) 929, 934. These items were disputed by Hutton in his evidence in so far as not allowed by the commissioner. The plaintiffs could have introduced Winchester to sustain or explain them or show to what extent they were correct. This they failed to do. The commissioner therefore committed no error in finding against them. The testimony of Winchester as to the books being correct was a mere general statement, and he was not interrogated as to the disputed items. The weight and sufficiency of the books as evidence is peculiarly a question of fact for the commissioner, as in a common law court it is a question for the jury. 9 Am. & En. En. Law, (2 Ed.) 936. The plaintiffs object to the allowance of the following sums on account of what are known as the Cheat purchases, to-wit, eight thousand four hundred and fourteen acres known as the C. & O. land, one thousand six hundred acres known as the Butcher Land, two thousand six hundred and eighty-nine acres known as Hutton Land, one thousand four hundred and seventy-six acres known as the Arnold & Yokum Land, three hundred and forty-eight acres known as the Crickard & Phillips Land, six hundred and eighty acres known as the Warwick Hutton Land, three hundred and eighty-six acres known as the Barlow Russell Land, five hundred and sixty-six acres known as J. W. Wamsley Land, nine hundred and one-half acres known as the McGee Land, two hundred and five acres known as the Curry's heirs' Land, and nineteen thousand seven hundred and sixty acres known as the Pardee-Curtin Land, and also eleven thousand eight hundred and eighty acres known as the Rich Pardee Land. All these lands Winchester testifies were included under his agreement with Hutton, and that therefore Hutton is entitled to payment for the same according to such agreement. The plaintiff insists that Winchester made the purchases himself, and Hutton is not entitled to compensation therefor. Winchester's evidence concludes the plaintiff on this subject. He was their agent and knows what lands were included in his contract with Hutton, and no one else does. Plaintiffs accepted these lands and now that they are fully advised as to the arrangement between Hutton and Winchester, they desire to retain the lands and repudiate the agreement under which

they were secured, and escape fulfilment thereof. This the law will in no wise permit them to do. If they want to escape from and repudiate Winchester's arrangement with Hutton, they must yield up the benefits accruing to them under such arrangement. Otherwise if they cling to the benefits they must assume the burdens. The plaintiffs imagine that by discharging Winchester as their agent and repudiating his agreement with Hutton that they have not only destroyed his competency as a witness against them, but that they have thereby relieved themselves from performing his contracts made in the purchase of the lands, the title to which they still retain. This is only imagination and not law. For by accepting and retaining the lands they are bound to carry out all contracts made by Winchester in procuring the same, and he is the best evidence as to what those contracts were and what lands were covered by them. Not only so, but the law requires them to introduce him as a witness as to the agreement with Hutton in the controversy between them as to the lands included thereunder, or admit that his evidence if introduced would sustain Hutton's pretensions. They fail to introduce him, but Hutton does and he sustains Hutton's claims as to the agreement. They say we have repudiated both him and his agreement. The law says, before you can do this return the benefits you are now enjoying by virtue of such agreement, otherwise carry it out to the letter. Disgorge or pay up. You can choose either horn of the dilemma. But you must choose one or the other. They further claim a deficiency of some of these tracts of land, to-wit: Rich, Pardee Land, and the Butcher School Lands. A great part of the former land they claim to have been lost while a suit is pending affecting a portion of the latter land. There is nothing to show that Hutton was to warrant the title to these lands. On account of the former, a large deduction was made in the compensation by arrangement between Winchester and Hutton and a satisfactory compensation agreed upon, and the plaintiffs accepted and still retain the deeds for the same. As before said, the plaintiffs cannot repudiate these contracts in part, but if they repudiate they must do so as a whole. The commissioner seems to have examined all these matters carefully and arrived at an apparently just conclusion, and the court is unable to say that any of his findings are manifestly contrary to the evidence. He closely follows the testimony of Winchester, and the plain-

tiffs have manifested no disposition to surrender any of their purchases, but cling to them with an unrelenting grasp.

Objection is made to the munificence of Hutton's compensation. The plaintiffs purchased all these lands at the low rate of two dollars per acre, and had Hutton been of sufficient ability to purchase and hold them himself it is altogether probable that the plaintiffs would have not been able to have secured them at any such price. So it is only Hutton's pecuniary condition that caused him to secure the lands for plaintiffs at such a reduced compensation. There is no doubt but if they would agree to cancel their purchases and surrender the lands to Hutton, he would be willing to restore them their purchase money with interest and costs. This under the law they have the right to do if Winchester exceeded his authority, but they must do so in whole and not in part. *Sillman* v. *Gillespie,* decided at this term. The two questions raised with regard to the Gauley purchase, to-wit, two hundred dollars on the Williams land and the Craig land are matters governed by the evidence. As to the two hundred dollars the commissioner follows the evidence of the plaintiffs' witness Mills. The plaintiffs claim the Craig land was sold for taxes. Hutton denies this, and says if it was and became irredeemable, it is the plaintiffs' fault. The commissioner's finding is in favor of Hutton. The court is unable to say that this finding is wrong, from the evidence.

Plaintiffs also call attention to the fact that from the Gauley purchase of fifty-three thousand acres they have lost thirteen thousand acres to J. N. Camden, and yet they are required to pay Hutton six thousand five hundred dollars compensation for securing the thirteen thousand acres thus lost, and if they fail to recover the amount thereof from Camden, it will be lost to them. The result in the other case establishes conclusively that they secured title to this land to hold it in trust for Camden, and then wrongfully set up adverse claim to it. The litigation was of their own making and the costs thereof the legitimate result which they can place on no one else. If they had permitted their agent to have transferred this land direct to Camden they would have avoided all litigation with regard to and all liability to Hutton for his share of the profit arising therefrom. Hutton in such an event would have had to look to Camden for his compensation, if any. As it now stands he has no one to look to but plaintiffs, and plaintiffs must look to Camden

under his contract with Winchester. This is a matter that was not brought to the attention of the lower court or commissioner, and is therefore improperly presented to this Court at this time and in this way. It is without jurisdiction to consider the same. Hutton's profits in this Gauley matter appear to have greatly dwindled. In the former case of *Hutton v. Dewing*, 42 W. Va. 691, it is conceded to have been at least twenty-five thousand dollars, a sum that JUDGE BRANNON considered magnificent and with which Hutton should have been satisfied instead of wanting to be admitted to partnership in any further profits from such lands, the value of which appeared then to be highly speculative and improbable although Dewing & Sons insisted on taking all risk thereof entirely alone. They at least did not 'indicate that they were willing to surrender the lands and receive their investment, interest and expenses. If Hutton's profits are reduced down to what they claim they should be he would receive less than ten thousand dollars, while their attitude in the other suit was that he would receive nearly thrice this sum. Then they were casting him overboard as a partner with his fair snare of profits. Now they are trying to get from him these profits, and have so far succeeded very well, and if they could manage to have their way in this suit, they would not only have been able through the management of their efficient agent Winchester to deprive him of all profit, but of all his property besides, and still bring him out in their debt to a magnificent amount. If such could possibly be the result, it would have been far better for him never to have heard of the plaintiffs. He would be as a lamb shorn in the bleak winter months, with a body untempered to the cold north winds.

The last and most important question for the consideration of this Court is the Arbogast store. The commissioner reports that exclusive of the Arbogast business Dewing & Sons would owe Hutton eleven thousand four hundred and twenty dollars and forty-seven cents which with five thousand two hundred and ninety dollars and seventy-six cents interest thereon would amount January 1, 1898, to the sum of sixteen thousand seven hundred and eleven dollars and twenty-three cents, all the residue of his compensation and profits having been absorbed by Winchester in the Arbogast business. The commissioner found that a partnership existed between Dewing & Sons and Hutton as to this business. That to make Dewing & Sons equal to Hut-

ton in the loss incurred thereby they should pay him four thousand two hundred and forty-one dollars and sixteen cents, which added to the thirty-three thousand one hundred and fifteen dollars and ninety-four cents, ascertained to be due Hutton on account of the Cheat and Gauley transactions, and augmented by twenty thousand five hundred and seventy-seven dollars and seventy-one cents interest thereon from the time the same should have been paid, aggregate the sum of fifty-seven thousand nine hundred and thirty-four dollars and eighty-one cents which Hutton should recover in this suit. He further finds that if the Arbogast business is Hutton's that Hutton owes Dewing & Sons on account thereof the sum of twenty-one thousand six hundred and ninety-five dollars and forty-seven cents which would reduce Hutton's recovery to eleven thousand four hundred and twenty dollars and forty-seven cents with its interest as aforesaid. But if the Arbogast business belongs to Dewing & Sons he finds that on account thereof they will owe Hutton thirty thousand one hundred and seventy-seven dollars and eighty cents, which added to his unpaid profits and commission would make his recovery sixty-three thousand two hundred and thirty-three dollars and seventy-four cents, which with interest thereon to January 21, 1898, to-wit, thirty-four thousand eight hundred and thirty-one dollars and twenty-four cents, would aggregate the sum of ninety-eight thousand sixty-four dollors and ninety-eight cents. On this question the circuit court overruled the commissioner and held that the Arbogast business belonged to Dewing & Sons and decreed against them accordingly. This Court is compelled to decide between the commissioner and the circuit court, and if from any reasonable view of the evidence the commissioner's finding was right, the circuit court erred, and the decree must be reversed. But if the commissioner's finding was contrary to the plain preponderance of evidence, the circuit court committed no error in setting it aside. Viewing the evidence as a whole, and in the absence of Winhester's evidence, which bears most severely against the plaintiffs, this Arbogast business has none of the elements of a partnership business, for it was wholly under the sole control and management of Winchester. It is true that both Dewing & Sons and Hutton furnished funds and property willing or unwilling for this business, but there was no agreement or understanding between them or with their agent Winchester that they were to

share in its profits and losses. While apparently it might be an equitable adjustment of the matter to hold it a partnership, the commissioner was not justified by a preponderance of the evidence in finding it to be such. Nor could the commissioner have found it to be Hutton's property. It was never in his possession, and he exercised no control thereover or management thereof, either in person or by agent. In short, he had no *indicia* of ownership whatever, and Winchester holding and controlling it through Arbogast denied him any such ownership. The plaintiffs insist, however, that because they induced him to execute to them a deed of trust securing their indebtedness including this business, that he is by this solemn act under seal estopped from denying the truth with regard thereto. If such deed could thus operate as an estoppel against him, this Court from the evidence would be justified in holding that the same was obtained from him by the plaintiffs by deceitful and fraudulent representations for the purpose of thus unjustly setting it up as an estoppel against him. For as shown in evidence the plaintiffs obtained this deed from Hutton by representing to him that their sole object in getting it was for the purpose of ridding themselves of their agent Winchester, who was running such business disastrously, especially as it now turns out that Hutton did not owe the plaintiffs twenty-five thousand dollars or any other sum at the time of the execution of such deed independent of such Arbogast business. This deed, however, operates as no estoppel upon Hutton except in so far as it prevents him from afterwards claiming that he did not thereby part with any possible interest he might have in the Arbogast business. The doctrine of estoppel is that a grantor in any deed cannot deny his title thereby conveyed and set up any other title to the injury of the grantee, but it does not prevent him from showing that the title was already in his grantee, and the object of the deed was merely to confirm the grantee's title, for thereby no injury can occur to such grantee. To confirm a title when doubt may attach to it does not injure it. In this case if Dewing & Sons were the true owners of the property a conveyance thereof by Hutton for their benefit could not possibly injure them, although Hutton had no interest therein, and he could not be estopped from saying that he had no interest therein, for the reason that they had already the whole title thereto, and he had only a possibly contingent interest therein

which he was willing on their importunity to surrender to them. The title to this property as heretofore determined by this Court on the former appeal in this case, 40 W. Va. 533, was "in abeyance apparently in Arbogast under the control of Winchester as the agent of the plaintiffs," and was so to remain as shown by Winchester's letter to the plaintiffs March 15, 1888, until a final settlement between plaintiffs and Hutton, and if the amount due Hutton was sufficient to cover the same the business was to be his, but on the contrary if there was nothing due him the business was to be plaintiffs. Under this arrangement of Winchester's communicated as a special report to his principals, and of which there is no positive evidence showing that Hutton knew of or acceded thereto, plaintiffs and Hutton appeared to be partners in adverse contingencies. In one event it was to be Hutton's business, in another it was to revert entirely to plaintiffs. So when plaintiffs obtained the deed of trust from Hutton they undoubtedly believed and had reason therefor that Hutton had no interest in this business, for he was not to have it until he was out of their debt, and as they were claiming that he owned them twenty-five thousand dollars, his contingent right of property had ceased to exist, and as they represented to him the only effect of his deed would be to take away Winchester's excuse for continuing to hold such property by reason of Hutton's non-existent contingent interest therein. This is further confirmed from the fact that plaintiffs did not consider the Arbogast business a sufficient security for their indebtedness, which it would have been had Hutton still an existent contingent interest under Winchester's arrangement, but required him to include in such trust deed a large amount of other property. So this deed, and the same may be said of the Arbogast deed, is plainly opposed to plaintiff's pretensions, that Hutton was the true owner of the Arbogast business. In addition we have the positive refusal of Winchester to surrender possession of the property by virtue of such deeds on the grounds that Hutton had no interest therein and no right to dispose of the same to a trustee or otherwise for the benefit of plaintiffs or anyone else, and he afterwards executed a deed as trustee disposing of the property to which all parties were compelled to assent, and which the court in its former decision upheld. As before said, there is no positive proof that Hutton knew of or assented to the arrangement communicated by Winchester to his princi-

pals, the plaintiffs, that he, Hutton, was to have the Arbogast business provided on a settlement with plaintiffs there was enough money due from them to him to cover such business. On this point Winchester is a necessary witness for plaintiffs, for he could have shown if true that Hutton knew of and acceded to his arrangement with regard to this business. His silence must be construed unfavorably to plaintiffs. They could and should have made this matter clear, and their hostility to Winchester cannot excuse them, for even if he had testified against them on this point, his positive evidence could not have been held any stronger against them than his silence. There is nothing in the case impeaching his integrity as a witness. The fact that plaintiffs have ceased to trust him as their agent does not do so, especially after they have secured through him all that they expected to secure, and they are engaged in attempting to hold the benefits but repudiate the responsibilities through which he accomplished his labors in their behalf. Through want of Winchester's testimony the court is left to grope its way in the dark without other guide than the dim light of meagre circumstantial evidence to a proper conclusion with regard to the Arbogast business. The plaintiffs deny it was their business, the defendant does likewise, while Winchester in his report says that he holds it in trust contingently for both parties. This contingency never happened as to Hutton, but did happen as to plaintiffs. Winchester was sent to West Virginia as the agent of the plaintiffs under the injunction of secrecy to purchase timber lands for them, with full power and authority to use all proper legal means to accomplish the purpose of his mission. Being unacquainted with the State and its residents, he found Hutton actively engaged in dealing in such lands to the full extent of his means. He thereupon immediately secured his services to purchase lands for him alone. Hutton entered earnestly into the work, and directly and indirectly with Winchester's assistance secured something over one hundred thousand acres. Dewings appear on the scene during the progress of the negotiations, and it becomes fully known that they are the power behind Winchester, but the extent of his agency is still kept a secret. In addition to the land purchases Winchester enters into the saw mill and timber business for the plaintiffs then under the theory that plaintiffs are going to embark largely in the timber and lumber

business and will need all kinds of stores, including horses, cattle, grain and feed, Winchester starts the Arbogast business with the funds furnished by plaintiffs to buy lands and carry on their timber operations. He takes into this business all of Hutton's personal property and even his lands for grain and grazing purposes. He reports the matter to the plaintiffs without Hutton's knowledge. Hutton so far as the evidence discloses believes and has reason to believe that in this business Winchester is still continuing to act as the agent of the plaintiffs. The plaintiffs fully informed by Winchester that he is carrying on the business for their benefit, as a means of finally paying Hutton, seemingly acquiesce therein, and do not disclose to anyone the extent of Winchester's agency for them until they have secured the lands they desire to purchase and find that Winchester is carrying on a losing business, then they endeavor to shift all responsibility therefor onto the shoulders of Hutton. They begin to repudiate Winchester's agency so far as the Arbogast business is concerned and to seek indirectly to oust him of its possession. They finally accomplish this and place it in the hands of trustee Harding, who proceeds to manage it for the best interests of all parties concerned. They again become dissatisfied with this arrangement, and have the court to take the property out of the hands of Harding, and place it in the hands of a receiver to be at once disposed of and the business closed. The property in this manner is sacrificed and the small amount of proceeds so used up in costs and expenses that it fails to pay even the Arbogast creditors, although the plaintiffs had twenty-one thousand six hundred and ninety-five dollars and forty-seven cents and Hutton thirty thousand one hundred and seventy-seven dollars and eighty cents invested therein. In other words it proves a complete loss. Undoubtedly Winchester in starting this business and in investing the plaintiffs' money therein exceeded his authority, but this was not known to Hutton, and could not be because the extent of Winchester's authority was a secret known only to Dewing & Sons and himself. Hence Hutton was led to trust him with full confidence in his agency as to such business. Winchester reported by letter to his principals on the 12th day of March, 1888, and informed them just how, so far as they were concerned, he was holding the Arbogast property as their agent and for their benefit. Yet they make no effort by letter or otherwise until the 16th of November, 1888, over nine months after

he notified them, to repudiate these acts as done in their behalf and as their agent when they are led to do so from the fact that they find that Winchester is carrying on a losing business. They do not act as principals should towards a trusted agent who has served them to the best of his skill and judgment, but indirectly try to get rid of him and deprive him of the possession of property he was holding subject to their orders. Had they acted openly, squarely and fairly with him much of the loss afterwards entailed would have been avoided and a much better feeling would have prevailed among the parties to this litigation. In 1 Am. & En. En. Law, (2 Ed.) 1206, the law is well stated to be, "When a delay might mislead the agent or other parties upon notice from the agent informing his principal of the transaction, it is the duty of the latter to repudiate promptly the act, if he wishes to avoid liability." And further, "A principal should within a reasonable time examine his agent's report and disavow such acts as are unauthorized, and if he fails to do so his silence will be deemed good evidence of a ratification. So it has been held that a ratification may be inferred where the agent has informed his principal of his acts by letter and received no reply." Had Dewing & Sons acted promtply with regard to the Arbogast business and notified Hutton and Winchester that they never authorized the same and would have nothing to do therewith, Hutton might have recovered his property before it was lost. In so far as the plaintiffs are concerned Winchester was Hutton's superior and Hutton had every reason to believe that all his acts were ratified by his principals who continued to furnish him all the money he required. It is well settled that of two parties equally innocent the loss must fall on the one whose act or omission to act occasioned it. *McConnell* v. *Rowland,* decided at this term. It would certainly be highly inequitable to visit this loss upon the sub-agent Hutton, and there is but one other alternative, and that is to permit it to rest on the plaintiffs as principals where the circuit court has placed it. This is not the irony of fate but of repudiation too late, due to trust and confidence too great. There is not a particle of evidence to show that Hutton when he turned his property over to Winchester did so on the strength of Winchester's credit alone, but plaintiffs knew from Winchester's statement that it was done on the credit they had given him by furnishing him with their funds and allowing him to act as their agent. Plaintiffs' repudiation came

too late and with bad grace. Having secured the timber lands they were after and holding on thereto, with firm grasp, they begin by repudiating Winchester's agency with regard to the Arbogast property but not until Hutton's property has been hopelessly involved therein. Next they repudiate Winchester as longer their agent or a competent witness in their behalf. Then they repudiate Camden's contract but fail to sustain themselves. They select out nearly every tract of land included in the Cheat purchases and seek to repudiate the arrangement between Hutton and Winchester with regard thereto. They successfully repudiate Hutton as a partner in the Gauley purchases. They set up defects in title and deficiency in lands, but never once intimate in all their repudiations of the acts of their agent a willingness to have their deeds cancelled, their money refunded, and a restoration in *statu quo.* It is hard for them to be responsible for the losses arising out of the Arbogast business, but they permitted their agent to start it without protest, acquiesced therein until others were misled thereby, and then proceeded to destroy the business and augment the losses in an unjust though legal manner. Having sowed tares themselves they should reap them, and not Hutton. If they will not forego the benefits arising from their agent's transactions authorized or not, they must endure the losses occasioned thereby.

The decree is affirmed.

*Affirmed.*