# CHARLESTON.

## BERRY *v.* COLBORN.

Submitted June 6, 1908.   Decided April 20, 1909.

1. APPEAL AND ERROR—*Review—Questions of Fact—Finding by Trial Court.*

    The rule, giving great weight, in the appellate court, to the finding of the trial court on a question of fact, lays no restraint upon the power of the former to ascertain, by full and careful investigation and analysis of the evidence, what the facts and circumstances are and whether the general finding is consistent therewith. (p. 498.)

2. EVIDENCE—*Sufficiency—Intent.*

    Flat contradiction in oral testimony, as to intent and purpose,

obscuring the truth and rendering it impossible to ascertain the same from such evidence with reasonable certainty, justifies resort to the circumstances as the safer guide, and their value and weight are determined by their intrinsic character and tendency to produce mental conviction rather than their number. (p. 498.)

3.  JOINT ADVENTURES—*Mutual Rights and Liabilities—Good Faith.*
    Two or more persons, associated together in a joint enterprise, contemplating pecuniary gain and advantages, under an agreement to combine their energies, or means, or both, for the accomplishment thereof, stand in a relation of confidence analogous to that subsisting between partners, and each must observe toward the others the utmost good faith. (p. 499.)

4.  SAME—*Secret Profit.*
    One of such persons cannot, consistently with equity and conscience, take to himself a secret profit, produced by the joint effort or work, and all such gain must be accounted for in the settlement of the social business and distribution of assets, if demanded of him. (p. 502.)

Appeal from Circuit Court, Marshall County.

Bill by J. W. Berry against C. B. Colborn and others. Decree for defendants, and complainant appeals.

*Reversed and Remanded.*

J. A. EWING and C. C. NEWMAN, for appellant.

J. B. SOMMERVILLE and HUBBARD & HUBBARD, for appellees.

POFFENBARGER, JUDGE:

A bill, filed in the circuit court of Ohio county, by J. W. Berry, to obtain a share in a commission of $10,000.00, which the Mound Coal Company agreed to pay, as compensation for the negotiation of a lease of its coal property to one J. E. Hedding, with the privilege of purchasing the same, at any time before January 1, 1911, for the sum of $150,000.00, was dismissed after a hearing on the merits, and Berry has appealed. One Charles D. Ames was made a defendant as an associate of Hedding in the purchase. J. C. McKinley, President of the Mound Coal Campany, was made a defendant in his individual capacity, he having been active in procuring the services of the agents. The real defendant, however, is C. B. Colborn, a real estate broker or agent, who claims the entire commission. Berry's bill proceeds upon the theory of his association as agent

with Colborn. The lease was executed on the 19th day of October, 1905, and Colborn, admitting that he had been previously associated with Berry in an effort to sell the property, claims this relationship had ceased at the time of the execution of the lease, and denies the right of Berry to participate in the commission arising therefrom. On the 9th day of May, 1905, the coal company executed and delivered a written instrument by which it authorized Berry, one Simon Kline and the firm of Colborn and Robinson to present a buyer for its property, and agreed to pay them a commission of $5,000.00, in case a "sale, trade or deal or exchange" of the property should be made directly or indirectly, through the instrumentality of the parties named. The right thus given was made exclusive until May 30, 1905. Under this arrangement, efforts to sell the property were made in which Colborn seems to have been more active and influential than any of the others. He conducted the correspondence with parties in Pennsylvania and met them personally, while Berry furnished him information concerning the property, acquired from McKinley, which he calls "data," and stood ready to take prospective purchasers through the mine and show them the qualities and advantages of the property. His claim is founded upon an alleged agreement with Colborn for a share in the commission and the rendition of services of the kind just indicated. While this right of sale was in force, the agents consulted one another and were jointly interested. Notwithstanding the expiration, on May 30, of the exclusive right of sale, this association and combination of effort continued without interruption until the 22nd day of September, 1905, when the coal company, by letter, directed to Colborn and Colborn and Robinson, revoked the power given on the 9th day of May, 1905, and directed them to consider "all arrangements, negotiations and options canceled, effective at once." But, according to the testimony of McKinley, Berry and others, the agents were verbally authorized on the next day, September 23, 1905, to continue their efforts to obtain a purchaser. The object of this seems to have been to place beyond doubt or question the release or expiration of the exclusive right of sale originally given. Berry says he went to Colborn on the 23rd day of September and told him McKinley had authorized them to continue their efforts and that Colborn

agreed to do so. The latter had received the letter of revocation on that morning or the preceding evening, and, considering the matter at an end, had· written a letter to some contemplated purchaser telling him so, but said he would destroy it and go on with the enterprise. This, Colborn denies, but there was no cessation of his effort to dispose of the property. Admitting that Berry came in and saw him after the notice of revocation had been received, he says the conversation between them was exactly contrary to what Berry says it was. He says Berry expressed the opinion that McKinley would let them go on, and he replied that he would have nothing more to do with it, and says he told Berry he had written a letter to a contemplated purchaser telling him to come and look at the property, and thereupon tore it up. His claim is that subsequently the coal company authorized him to negotiate a lease, not a sale, of it, and that, although Berry had been interested in the original agreement and effort to sell, he had no part or interest in the new agreement for commission to arise from the negotiation of the lease thereof. The verbal authorization to Berry to continue his effort to procure a purchaser was never withdrawn. McKinley says he had personal and telephone communication with him, concerning the prospects of sale after the 23rd day of September, 1905, and furnished him a revised statement or memorandum of the property, both real and personal, as a means of aiding him in his negotiations or efforts. A copy of this statement is exhibited with McKinley's deposition. He says, however, that about a week after the 23rd of September he met Colborn, who stopped him and asked him what was being done about the Mound Coal Company, and, being informed that nothing had been done, asked the privilege of negotiating a lease of it, which was granted. He saw nothing more of Colborn until after October 19th, but had a conversation with him over the telephone on that date. He furnished Colborn no information but talked with Berry from time to time over the telephone about the property. Even after that date, the date of the agreement of the lease, McKinley conversed with Berry about the property, but gave him no information as to what had been done. He explains this by saying they did not want to make the matter public, as they were in doubt about its consummation and they had been requested

by Colborn not to mention it to Berry or anybody else. Berry was specifically named as one of the parties to whom it was not to be communicated. That McKinley kept Berry interested in the property after September 23rd, is further shown by the testimony of Harry R. Jungling, an employe. He says McKinley called Berry up frequently and talked to him about the disposition of the property. He also heard conversations between Colborn and McKinley, or rather heard McKinley talk to Colborn over the telephone and tell the latter Berry knew nothing of the leasing of the property and ask him if he did not think Berry would be "hot" and ought to have something out of the transaction. Hedding and Ames, accompanied by Colborn, came to look at the property on the 18th or 19th of October, and Berry took them through the mine. Hedding says he had come to Wheeling to look at the Glendale coal property, but Colborn told him it had been sold and suggested that he go to Moundsville and look at the Mound Coal Company property. He says he did not inform Berry that he contemplated purchasing the proprty, but admits having asked him about the condition of the mine. He says he had had previous correspondence with Colborn, concerning the Glendale property, in which the latter had merely referred to the Mound Coal Company property, and that, on the 18th day of October, Colborn had shown him the "data" of that property. He thinks it was not the last paper McKinley had given to Berry, his recollection being that it was not so full and complete as that paper, but he was unable to point out any particular difference between them. Berry says Colborn called him up by telephone sometime after September 23rd and asked him for the memorandum and he thereupon called for McKinley who was not then in, but who, on the next morning, called him up, and, on being told that Colborn needed the paper, promised to prepare it immediately. On the next morning, he received it by mail and mailed it to Colborn, and, on the next morning, had called him up by telephone to know if he had received it and he said he had. He heard nothing more from Colborn until the evening of October 17th, when he told him over the telephone, he would be there the next day with some parties to examine the mine and asked him to have everything in good shape. Colborn denies all this, but says he had some conversations and transactions with Berry during the period aforesaid,

concerning another piece of property lying on the Ohio side of the river and owned by Berry's brother. There is much contradictory evidence in the record concerning what took place between Berry and Colborn on September 23rd, the former insisting that Colborn agreed to continue the relation previously subsisting between them and he as emphatically denying it. As to the substance of the conversation had on that day, Berry is sustained by the testimony of his brother, and Colborn by one Brown, who occupied the office, in which the conversation occurred, jointly with Colborn, the latter having desk room in the office of which Brown had charge.

On the issue raised by the pleadings and evidence, largely one of fact, the court below found in favor of the defendant, and he invokes the rule, so well known as to require no citation of authority, giving such finding weight in the appellate court. While this rule is to be respected and observed, no case is governed by it that does not fall within it. The exception to it is as well established as the rule itself and the appellate court will always scrutinize the evidence and circumstances to enable it to determine whether the finding is contrary to the evidence or against conscience. We said in *Hursey* v. *Hursey,* 56 W. Va. 148, 155, that the rule "lays no restrain upon the power of the court to make a full investigation, and careful analysis of the evidence with the view to ascertaining whether there is conflict and whether the decision rests upon findings of fact supported by substantial proof." Of course, no such finding should stand against the great weight and preponderance of the evidence. The verdict of a jury will be set aside, if it is against the plain and unequivocal inferences, arising from admitted or established facts. *Chapman* v. *Liverpool &c. Co.,* 57 W. Va. 395; *Davidson* v. *Pittsburg &c. R. Co.,* 41 W. Va. 407; *Manss-Bruning Shoe Co.* v. *Prince,* 51 W. Va. 510; *Johnson* v. *Burns,* 39 W. Va. 658.

The court below proceeded upon the theory that an entirely new arrangement and contract was made between Colborn and the coal company after the 23rd day of September, 1905, to which Berry was not a party, and its conclusion seems to be based almost wholly upon the deviation of the new arrangement from the old, or the fact that the new agreement was for the negotiation of a lease, while the old one was for the

negotiation of a sale. His written opinion, incorporated in one of the briefs, indicates that he gives controlling effect to this circumstance. He says: "No new or different arrangement was ever made by Berry after that, and it is clear that this arrangement was never carried out. The purchaser was never produced and the $5,000 was never earned. Some time after this McKinley entered into a new agreement with Colborn under which, if Colborn produced a person who would lease the mine upon certain conditions and pay a stipulated royalty, Colborn should receive a stipulated commission. This was clearly a new contract between Colborn and the coal company. Berry was not a party to it or included in it." He proceeds to point out then that Berry's contract or agreement for sale still subsisted and might be performed by him and the $5,000 commission earned. The lease, however, it will be remembered, gave an option of purchase at a certain price, which put it beyond Berry's power to effect a sale of the property after the lease had been executed. This superseded the whole previous arrangement. Furthermore, the execution of the lease itself put a new face on the whole situation. A piece of property subject to a twenty year lease is quite different from the same property free from lease, as a commercial subject. If we could treat the two authorizations as independent, they were clearly not consistent. So regarded, they were contradictory and conflicting. But, in our opinion, they were not independent. Tested by the terms used, the so-called new arrangement or agreement, except as to the amount of the commission, was included in, and covered by, the authority originally given in writing and later verbally renewed in part—continued as a non-exclusive, instead of an exclusive, right. The original authorization was not limited to the production of a purchaser. Its terms were broader. It provided for the payment of a commission if a sale, trade, deal or exchange should be directly or indirectly made through the instrumentality of the agents. It would be difficult to conceive a broader, more general power of disposition. The word "deal," used in this connection, seems to us to be amply sufficient in breadth and scope to cover the leasing of the property. The agreement to lease was new in a subsidiary sense only. It amounted to a resolution or decision to select, act upon or follow one of the several modes of execution of the

general plan of disposition, included in the first authorization, and a stipulation for increased compensation. In all except the increase of compensation, it was a mere change of procedure or mode of execution, not constituting even a modification of the original agreement. All the circumstances combine in argument to sustain the position of Berry and condemn that of Colborn. He says he told Berry he had quit and would have nothing more to do with the property. In contradiction of this, he secretly continued and effected the lease. He not only did that, but he used, in his subsequent efforts and operations, the papers and materials furnished him by Berry for the purpose of carrying out the original enterprise. It is strange that, if he decided to quit, he did not return to Berry the memoranda he had furnished him, showing the character and condition of the property, Berry having just told him he thought McKinley would let them go on and expressed a desire to do so. . Is it possible he thought this memoranda would be useless to Berry or that his decision not to prosecute further would necessarily put an end to the latter's efforts? If Colborn told Berry he had quit, the latter would naturally have demanded the papers back. His not having done so and Colborn's failure to offer them, are circumstances, strongly tending to support Berry. It is not likely that both forgot to mention the papers. It may be said Colborn does not admit having received memoranda from Berry. Where did he get the memorandum he showed Hedding? He does not say McKinley gave him any and Berry proves acquisition of them from McKinley and says he delivered them to Colborn, who admits that, until September 22, 1905, he, in conjunction with Berry, was endeavoring to sell the property. Is it likely he was carrying on negotiations with Stofer and others without being able to give them any information about the property? He showed Hedding a memorandum. McKinley says he furnished him none, but did furnish Berry data. What is the plain inference, in view of the previous association of these men? That Berry gave Colborn the data he got from McKinley. The circumstances clearly outweigh Colborn's protestations. That there was a verbal authorization to Berry after September 22nd, and that he relied upon it and acted under it down to the moment of the execution of the lease to Hedding and even afterwards, and believed he was acting

under it, when he showed Hedding and Ames through the mine and gave them information, are facts overwhelmingly established. They do not depend upon his testimony alone. That of McKinley proves them. It was intended that he should do so and also that he should be kept in ignorance of the negotiations for a lease. The testimony of McKinley establishes this fact. Colborn does not pretend to have given Berry notice of the new contract or his independent action. He took Hedding and Ames to the mine and turned them over to Berry precisely as he would have done, had he been acting under the original arrangement. He says he asked Dr. Haning, one of the owners, on the morning of October 18th, to arrange with Mr. Hubbard, another of them, for his going through the mine that day, and thereby intimates a supposition on his part, when he took Hedding and Ames down, that they had so arranged. Mr. Hubbard says nothing of it in his testimony and Dr. Haning was not examined. Under such circumstances, there is a presumption that the witnesses would not have said such a thing had occurred. An important question was whether Colborn made the arrangement direct with Berry. The latter says he did. He denies it and says the company did it, and names the man whose testimony would sustain him, if he is correct; but fails to put him on the stand. We must assume the witness, if called, would have testified adversely to him in respect to that matter. *Garber* v. *Blatchley,* 51 W. Va. 147; *Dewing* v. *Hutton,* 48 W. Va. 576. The agreement for a larger commission than that originally contemplated may well be regarded as a mere modification of the old arrangement. Colborn wanted more money and the exclusion of Berry. To procure the additional money, he no doubt intimated to McKinley intention to cease his efforts, if the commission were not increased. The inducement or consideration for the increase is not explained by either Colborn or McKinley. A lease could have been of no greater value to the company than a sale. Colborn still needed Berry's services, for which reason he was not notified. The coal company's object was to dispose of the property. Who should receive the commission was a matter of little or no consequence to it. It did not feel called upon either to aid or obstruct Colborn's effort to obtain Berry's services and yet exclude him from participation in the commission. On the whole, the circumstances heavily outweigh the testimony of Colborn, so much, indeed,

that we are bound to reverse the finding of the trial court. Deeming it applicable, we quote the following from *Hale* v. *Hale,* 62 W. Va. 609, concerning the weight to be given to circumstances, when oral evidence, as to intent and purpose, is conflicting: "The flat contradiction of the direct. and positive oral evidence, pro and con, brings into play the circumstances and necessarily gives them unusual prominence and force. To them the court must appeal for the truth, it having been effectually obscured by the testimony of the parties, and the duty of the court cannot be evaded or excused by the difficulty or painfulness of the task. Nor is its investigation or power to act limited by the mere number of the circumstances to be considered. Their intrinsic character and power to carry mental conviction as to the truth is always allowed to prevail."

Though the court below, denying the right to an accounting, has not determined the basis thereof, that question should be settled here. As we have concluded the plaintiff is entitled to participate in the commission, we see no reason why we should not define and indicate the. extent of the right of participation. The cause is to be remanded for an accounting, and, as a precaution against another appeal, in respect to a matter now before this Court and susceptible of determination, we ought to state the principle governing its final disposition as far as we can safely do so.

The relation originally subsisting between Berry and Colborn and never dissolved, as we have concluded, was one of partnership or joint agency. Strictly, it may not have been a partnership in all respects, but it was a joint enterprise, involving a community of interest and combination or. union of effort, elements, features or factors of a co-partnership. Naturally, then their rights ought to be determined by the principles governing co-partnership as far as they are applicable. Between co-partners, trustees and *cestuis que trustent* and principal and agent, the utmost good faith must be observed and practiced. One partner cannot speculate for his private interest upon the assets or business of the firm. Secret private advantages cannot be taken by the trustee at the expense of his *cestui que trust* or private profits directly taken from the trust in any way. The agent cannot use the agency as a means of secret self-aggrandizement. In all these cases the secret profits must be accounted for, if the

associate or *cestui que trust* demands an accounting. As to the application of this principle among partners, see *Tomlinson* v. *Polsley,* 31 W. Va. 108, and *McMahon* v. *McClernan,* 10 W. Va. 419. As to its application between principal and agent, see *Dorr* v. *Camden,* 55 W. Va. 226. The relation of trustee and *cestui que trust* being still closer and more confidential in its nature, no authority need be cited for the application of the doctrine between them. Applying it here, we hold that Berry is entitled to one-half of the commission earned, after all expenses and proper charges thereon shall have been deducted. What expenses, if any, exist and are chargeable against the fund, is a matter for ascertainment in the court below.

From the principles and conclusions above stated, it results that the decree complained of must be reversed, the temporary injunction reinstated and the cause remanded for further proceedings.

*Reversed and Remanded.*