C. F. O'NEIL, Appellee, v. L. L. STOLL, Appellant; HARLAN NATIONAL BANK et al., Co-defendants, Appellees.

No. 42399.

JUNE 23, 1934.

REHEARING DENIED OCTOBER 25, 1934.

White & White, for appellant Stoll.

Bennett Cullison, for appellee O'Neil.

V. H. Byers, for appellees Harlan Nat. Bank and Peterson.

MITCHELL, J.—The appellant, Stoll, was engaged in the business of selling pure-bred draft stallions to farmers. The plan involved selling breeding shares or interests to a · club or association of farmers. In the case at bar the selling price of the horse was $3,600; said consideration being raised by selling sixty breeding interests at $60 each, represented by notes. A written contract was entered into between the appellant, Stoll, and the appellee O'Neil, and was as follows:

"This agreement made and entered into this 4th day of November, 1931. By and between L. L. Stoll, party of the first part, and C. F. O'Neil and W. E. Peterson, parties of the second part. Whereby the party of the 1st part agree to furnish Stallions *for second partie to sell,* And in consideration of that service 1st party to pay second parties the sum or comm of 25% of total· selling price. said commissions to be paid as follows .40% at time notes are put and money barrowed and the balance of comm to be paid as the notes collected. Second parties to stand there portionate share of loss and discounts. When notes are released from barrowing, Parties to. this contract have the privilege of deviding the notes just as they are. This contract is contingent upon parties hereto, raising enough money to carry on. *It is agreed that second parties shall stand all*

*selling expense.* This agreement becomes void and of no further effect July 1st, 1932. It is agreed that the First party shall stand good on the guaranteeing of all Stallions."

After the execution of the contract, Stoll and O'Neil went to Blair, Nebraska, to sell a stallion. Stoll furnished the stallion, known in the record by the name of Felix. They fixed the price that Felix should bring at $3,600, and the plan was to raise this amount of money by selling sixty breeding interests to various farmers in the community. A man buying one interest would pay for it by giving three notes of $20, payable each year, for three years. O'Neil and Stoll went together in a car furnished by O'Neil. Felix, the horse, was either led by another man or was sometimes driven. It appears that O'Neil and Stoll would wait along the road until Felix had reached the next prospective customer's place; Felix always being brought into the farmer's presence before O'Neil and Stoll arrived. O'Neil and Stoll stayed together some few weeks, selling interests in Felix. They were successful to the extent that they had convinced forty farmers that the proposition was a good one and that an interest in Felix was worth $60. It does appear in the record that Stoll was by all odds the best salesman; that O'Neil was without experience in selling horses, and that most of the selling was done by Stoll. However, O'Neil was along; it was his car they drove, and he advanced the expense money during the first few weeks that the campaign was on to sell Felix. When they had sold forty shares, Felix was taken sick. Without the presence of Felix it was of course impossible, even for an experienced horse seller, to sell interests in the horse, and so Stoll and O'Neil put Felix under the care of a veterinarian and returned to their homes in Iowa. This was in the fall of the year. Once or twice during the winter months, in O'Neil's car and at his expense, they took a trip to see Felix, to ascertain the state of his health. Finally, in the spring, Felix had recovered, and it was time to wage a campaign to sell the remaining interests.

There is some dispute in the record in regard to just what happened then. O'Neil said his wife was sick and he told Stoll he could not go at that time and Stoll said it would be all right. There is no dispute in the record, however, that Stoll went out and sold the remaining interests in Felix and secured the notes which the farmers paid for their interests. In so doing Stoll incurred certain

expenses which were not paid by O'Neil. No demand was made by Stoll upon O'Neil for this expense money. Stoll kept all the notes and did not account to O'Neil, and O'Neil commenced this action in equity, seeking to recover against Stoll for an accounting for the proceeds of the sale of Felix. Two other defendants were joined in the original petition, to wit, W. E. Peterson, who disclaimed any interest in the matter, and the Harlan National Bank, and the case was continued as to the Harlan National Bank until after decision in the case against Stoll. The case proceeded to trial. Evidence was offered, and the lower court found for O'Neil and held that he was entitled under the contract to recover 25 per cent of the $3,600, less the sum of $305, which was the amount of money which Stoll had expended from his own funds in selling the remaining interests after O'Neil had left him. After the deduction of the expense money advanced by Stoll, O'Neil was entitled to a judgment against Stoll in the amount of $595 and the costs of the action, and judgment was so entered.

Stoll, being dissatisfied with the decree and judgment of the lower court, has appealed to this court.

It should be observed that this is not an agreement for the sale of a stallion for a commission in the ordinary sense of the word. The method used by the parties was to make the sale under a promotional scheme, whereby groups of individual farmers were organized into what were called "colt clubs", and the sale resulted in the promotion of the club by selling interests to the various members. The individual farmers who purchased the $60 interest represented by the notes which they gave to the promoters, Stoll and O'Neil, did not become the owners of the stallion except in the sense that their membership in the colt club entitled them to the use of the stallion, along with the other members. The object of the whole transaction was to promote the sale of the good horse Felix at a big price, upon deferred payments, to many persons. The parties to this contract were well aware of this whole scheme. It was contemplated by the parties that each of them should furnish certain capital. Stoll was to furnish the horse, O'Neil the expenses for the promotion and sale of the horse. They both agreed in the contract with reference to the sharing of losses, for the contract specifically stated that they agreed to stand their proportionate share of loss and discounts. The express contract contemplated that the earnings or capital of the adventure were to be used for the pur-

pose of the furtherance of the adventure, because it provided for a division of the proceeds when the notes were released from borrowing, either in cash or in kind. Nowhere in the agreement is there any requirement on the part of the appellee that he was to do all of the selling. Nowhere in the agreement is there anything which would indicate that the failure on the part of the appellee to completely and alone consummate the proposed transaction would be a material breach of the contract on his part, because he does not expressly undertake to make any sales. An examination of the instrument discloses that many of the elements of a joint adventure are present. The record shows that from the very inception of the agreement appellant participated in the sale of the stallion along with the appellee. He accepted the advantages of expenses met by O'Neil and retained the benefits derived from the labor performed by O'Neil.

In the case of Tusant & Son Co. v. Chas Weitz Sons, 195 Iowa 1386, at pages 1387, 1388, 191 N. W. 884, 885, this court said:

"The law in regard to joint adventure is of comparatively recent origin. It is analogous to the law of partnership in many respects, but not identical with it. * * *

"In Wilson v. Maryland [152 Minn. 506], 189 N. W. 437, the Supreme Court of Minnesota recently said: 'To constitute a joint adventure two parties must combine their property, money, efforts, skill or knowledge in some common undertaking.' In Fletcher v. Fletcher, 206 Mich. 153, 172 N. W. 436, the Supreme Court of that state defined a joint adventure as: 'an association of two or more persons to carry out a single business enterprise for profit'."

Thus we find that in the case at bar these two men entered into this written agreement. It is true the record shows that Stoll was by all odds a better salesman than O'Neil. It is true the record shows that it was through the efforts of Stoll most of the interests in the horse Felix were sold. But it is also true that O'Neil furnished the car and paid the expenses up to the time that Felix was taken sick, and that at that time they had sold forty interests and had received $2,400 from the farmers who had purchased these interests, in notes. Even after Felix was taken sick, both the appellant and appellee went over to see how the horse was getting along, and after that time the appellee advanced expense money and the appellant used appellee's car. At no time did the appellant rescind

the contract, nor does he claim any damages for failure to perform.

In the case of Kaufman v. Catzen, reported in 81 W. Va. 1, 94 S. E. 388, 391, 392, L. R. A. 1918B, 672, the West Virginia court said:

"Having accepted the benefit of Kaufman's money and obligated himself, in consideration thereof, to assign to him a one-third interest in the contract procured by the use of such money, Catzen cannot retain the benefit thereof and declare Kaufman's interest in the contract forfeited by reason of his breach of his agreement to aid in the development of the property, or his obstruction thereof. Such conduct may have afforded him ample ground for rescission of the contract, but he was bound to elect whether he would rescind and repay the money, thereby putting Kaufman in statu quo, or seek compensation for any damages he may have suffered in consequence of Kaufman's neglect, default, or misconduct in some other way. Such dereliction would have justified his own abandonment of the contract and relieved him of further performance thereof but that would not have effected a rescission, nor conferred right on him to retain the benefit of the large sum paid. In consequence of such abandonment, the money might have been lost, but that loss would have been an incident of the loss of the enterprise. The contract between them was not an entire working contract, made between persons sustaining no fiduciary relation. It was a joint enterprise to be conducted by both of them, wherefore failure of either fully to perform his part did not forfeit his fully acquired interest. Notwithstanding defaults and omissions, each has an interest in such assets as have been preserved or accumulated. Tested by the contract proved, the relation established between the parties may be that of joint adventurers, whose rights, obligations, and duties are similar to those obtaining among partners. That it may not be strictly one of copartnership is not really an important factor in the present inquiry. Berry v. Colborn, 65 W. Va. 493, 64 S. E. 636, 17 Ann. Cas. 1018; 15 R. C. L., p. 500, title Joint Adventure, section 2; 23 Cyc. 453. Kaufman's default may have conferred right upon Catzen to sue him either for contribution or reimbursement for funds advanced, or damages for breach of the contract. Saunders v. McDonough, 191 Ala. 119, 67 So. 591, 595; Lind v. Webber, 36 Nev. 623, 134 P. 461, 135 P. 139, 141 P. 458, 50 L. R. A. (N. S.) 1046, Ann. Cas. 1916A, 1202, note 1214; 15 R.

C. L. 507; 23 Cyc. 457. But, after an investment has been made and valuable property acquired by the use of the funds of an adventurer or partner, his coadventurer or copartner cannot wholly exclude him from enjoyment thereof, or forfeit his title or right for failure to comply with the terms of his agreement."

And so it is in the case at bar. The appellant retains the benefits that the appellee advanced by way of expenses and labor in the sale of Felix. There is no evidence of rescission, no offer on the part of the appellant to return that which was contributed by the appellee, no claim for damages or evidence upon which any damages could be ascertained. What the appellant seeks is not a rescission, but a forfeiture, a penalty which the law abhors. The contract in this case did not provide for a forfeiture. Clearly, upon this record, the appellee was entitled to recover his share of what the good horse Felix brought, in accordance with the terms of the contract. This was the finding and decree of the lower court. And the judgment and decree of the lower court must be, and it is hereby, affirmed.

CLAUSSEN, C. J., and EVANS, ALBERT, ANDERSON, DONEGAN, and KINTZINGER, JJ., concur.