(78 South. 160)

McDONOUGH et al. v. SAUNDERS.

SAUNDERS v. McDONOUGH et al.

(6 Div. 448, 448a.)

(Supreme Court of Alabama. Nov. 15, 1917. On Application for Rehearing, Feb. 16, 1918.)

1. JOINT ADVENTURES ☞1—TERMINATION.

Where a continuing contract to jointly acquire land existed, and several attempts to acquire the land had failed, failure of one to perform by paying his share of money under a contract with the owners did not terminate the joint adventure, in the absence of a prior agreement to such effect.

2. JOINT ADVENTURES ☞4(1)—TERMINATION OF RELATION.

A joint adventure may be dissolved at any time by one of the parties, but vested or accrued rights cannot be defeated, and dissolution will be delayed if irreparable injury would result from immediate dissolution.

3. JOINT ADVENTURES ☞4(1) — EXPELLING MEMBER.

In the absence of an agreement, partners in a joint adventure cannot forfeit the rights of a member, or expel him even if they pay him what is due him, unless there are gross faults, and mere failure to pay his part of expenses or promptly to perform his part of the services is not enough.

4. EQUITY ☞24—FORFEITURES.

Courts of equity abhor forfeitures, and will never enforce them, unless necessary to enforce the law, and to do justice between the parties.

5. CONTRACTS ☞75(2)—CONSIDERATION—PERFORMANCE OF LEGAL OBLIGATION.

Where one has contracted to convey land, subsequent promises to pay him additional consideration as an inducement to perform are void and without effect.

6. JOINT ADVENTURES ☞5(2)—TERMINATION—EVIDENCE.

Evidence *held* insufficient to show conduct on part of a joint adventurer warranting dissolution of the joint adventure, or his expulsion.

On Application for Rehearing.

7. JOINT ADVENTURES ☞5(1) — FAILURE TO ACCOUNT—JOINT AND SEVERAL DECREE.

Where joint adventurers refused to account to a member, he was entitled on recovery to a joint and several decree against them.

Appeal from Chancery Court, Jefferson County; A. H. Benners, Chancellor.

Bill by Warwick Saunders against R. N. McDonough and others to restrain and enjoin the selling, pledging, or transferring of certain stock and bonds of the Self-Fluxing Ore & Iron Company, and for an accounting and other relief. From a decree for plaintiff, both parties appeal. Modified and affirmed.

The letter agreement referred to in the opinion is as follows:

"Birmingham, Ala. July 5, 1912.

"Mr. Warwick Saunders, Birmingham, Alabama—Dear Sir: With reference to the sale of two certain tracts of ore land, one of about 1,-

515 acres and the other of about 800 acres, controlled by us in Shades Valley, will say that we desire to have you become interested with us in the sale of this property, and in doing so we are willing to allow you 20 per cent. of the profits derived from the sale of the above-mentioned land. But it is understood that you are to defray your own expenses, and will not be paid from the proceeds of the sale of land. If you are willing to give this your time and best efforts, we will give you the exclusive sale of same; but, on the contrary, should you become negligent, and, in our opinion, abandon the proposition, then we would reserve the right to cancel the agreement, giving you ten days' notice, providing that should we avail ourselves of the negotiations pending under the terms of this letter, that your commission will be recognized. This agreement will be considered in force and effect until the 15th day of November, 1912. We will further agree that in the event we decide it is to the best interest of all parties to this agreement to form a corporation with the view of purchasing the lands mentioned above, we will allow you the privilege of bonding the lands to enable us to develop and mine the ore. If you are successful in this undertaking, we will give you 33 per cent. of the corporation's stock after all incumbrances, including our profits, together with your pro rata, are paid on the properties. In the event we should sell either tract of the land by November 15, 1912, or no sale be effected, we will give you the option or right to join us in the purchase of either or both tracts of land at the same rate per acre as we pay, to the extent of 20 per cent. of the same. We reserve the right to control the price on this land at all times, and no price will be made or changed without permission. In the event that any part of this land cannot be delivered on account of reasons unknown to parties of this agreement, we will not be held liable for any damages or fees that might be claimed by you. We will use our best efforts to keep you posted, and you will have our co-operation in all negotiations pertaining to the sale of the above land, and we will expect you to keep us posted at all times, giving in detail as near as possible all transactions.

"[Signed] J. J. Shannon.
"R. N. McDonough.
"W. A. Porter.
"J. H. McDonough.

"July 5, 1912.

"The terms and conditions expressed in the above letter or agreement is hereby approved and accepted. [Signed] Warwick Saunders."

Garber & Garber and Percy, Benners & Burr, all of Birmingham, for appellants and cross-appellees. Tillman, Bradley & Morrow, John S. Stone, and William B. White, all of Birmingham, for appellee and cross-appellant.

MAYFIELD, J. Most all of the equities of the bill and questions of law involved in this appeal were stated and settled on the former appeal, and it is therefore unnecessary to restate them on this appeal. See report of that appeal and opinion in 191 Ala. 119, 67 South. 591. The questions involved on this appeal, and upon which the rights of the parties thereto depend, are mainly, though not exclusively, disputed questions of fact. The appellee sought by his bill, and obtain-

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

201 ALA.—21

ed a decree in the lower court, an accounting between the appellants and himself as to the proceeds of a joint adventure in the purchase and sale of a body of land rich in iron ore—the main defense relied upon being that complainant was not a member of the adventure when the land was bought or sold by them; that, by a failure to perform his part of the joint adventure contract or agreement, the joint adventure, so far as he was concerned, terminated by his breach or failure to perform, as agreed, and his rights to further participate with appellants in the purchase and sale of the lands were forfeited; that, after complainant had thus forfeited his right in the joint adventure, the complainants entered into another and a subsequent agreement between themselves and the owners of the land, whereby the lands were purchased and sold; that complainant was not a party to this agreement, and therefore not entitled to share in the profits. There can be no doubt that a joint adventure once existed between the parties as alleged in the bill, for the purpose of buying and selling these lands, the subject-matter of the suit.

There is likewise no doubt about the fact that all parties operated for several months as partners under their joint adventure' agreement; that all parties contributed more or less time, labor, and means to the adventure, and that the adventure ultimately succeeded, and large profits were, or will be, realized by each of the appellants—the much disputed question being whether or not complainant is entitled to share these profits with the appellants, and that question is made to depend almost, if not entirely, upon the question as to whether or not he forfeited his rights under the joint adventure agreement by failing or refusing to perform his part of the agreement. Appellants contend that he did so forfeit his rights to further participate in the enterprise, while he contends, and the chancellor so found, that he had not so forfeited his rights, and that he was entitled to participate in the proceeds of the adventure; that he was required to bear his pro rata share of the burdens, and was entitled to share in the profits.

It is conceded by appellant that if the lands had been acquired on the 2d day of January, 1913, under an agreement then existing, that complainant would be entitled to share with appellants in the adventure. Appellants, however, insist that the lands were not acquired on that day, or under the then existing agreement or contract with the owners, for the sole reason that complainant failed to pay, or even to offer to pay, his part of the purchase price required to be in cash; that on account of this failure of complainant, the appellants were entitled to terminate the joint adventure, and so notified complainant, and the next day appellants under a new and different contract with the owner acquired the lands, and that complainant was not a party to this agreement, and had no legal or equitable right to participate in the last agreement, which was consummated. If the joint adventure, in which complainant was interested, was lawfully terminated on January 2d, then of course he would have no right to an accounting as for a purchase and sale of the lands by the appellants on the 3d day of January, as to which he was not a party, whatever rights he might have to other remedies against appellants or the owners of the land. We, however, agree with the chancellor that the evidence fails to show that the joint adventure was lawfully terminated on January 2, 1913, so as to eliminate the complainant from his right to share with appellants in the purchase and resale of the lands.

[1] It may be that one particular contract or agreement which the joint adventurers had with Aldrich and Towers, the owners of the land, to acquire it by purchase, expired on January 2, 1913, and it may be conceded that this particular agreement to purchase from the owners was not consummated because complainant failed to meet his part of the agreement, but this did not in law or fact terminate the joint adventure to acquire the lands. It only necessitated the remaking of a new agreement or contract by the joint adventurers with the owners, which was in fact done by four of the five joint adventurers. The complainant was given no opportunity to join with them in this last agreement, by which they acquired the lands. There is no claim that he declined or failed to join with them in this last contract or agreement of January 3d, by which the lands were acquired; the contention of appellants being that, having failed to perform his part under the contract with the owners' which expired on January 2d, that this, without more, ended the joint adventure, so far as complainant was concerned, or, if it did not ipso facto terminate it, that it was sufficient grounds for appellants to terminate the joint adventure by electing so to do and giving notice thereof to complainant that it was so terminated, and he thereby eliminated.

If the joint adventure had consisted solely and exclusively of the contract of November 26th, if that had been its inception and its end, then a failure on the part of complainant to perform his part of the agreement would be ground for his coadventurers to terminate the first adventure and to eliminate complainant when this was done, and his coadventurers could have alone entered into new compacts with Aldrich and Towers, the owners, as to purchasing the lands. The contract or agreement of November 26th, however, was not the beginning nor the end of the first adventure between the parties to acquire the lands in question. It was merely one of several plans by which the joint adventurers were to acquire the lands from Aldrich and Towers. The failure of that plan or scheme did not alone end the joint adventure any more than did the fail-

ure to exercise the option to purchase of August 8th, or the failure to sell by November 15th. Each of these was really one of several plans; schemes, or modes by which all of the joint adventurers had planned and hoped to realize large profits from the purchase or sale, one or both, of the lands. The joint adventure between the five parties to this suit, the two McDonoughs, Shannon, Porter, and Saunders, had its inception, by letter agreement of July 5, 1912, while one plan or scheme of the joint adventure expired November 15, 1912, another scheme or plan only began on that date, and unlike the first did not provide when it should end, but, so far as the language of the contract was concerned, was to continue indefinitely, or until the end desired was attained; that is, until the land was acquired by a purchase thereof and resold, or operated by them jointly. The reporter will set out this letter contract of July 5th in full. By the terms of this joint adventure Saunders was given the exclusive option to sell the lands under the option held by his coadventurers until November 15, 1912. This exclusive right to sell, however, expired by its terms on November 15, 1912, but this did not end the joint adventure. If the first plan did not succeed, the contract provided that after November 15, 1912, another or other plans should be adopted or pursued to promote and accomplish the desired end; that is, to purchase and resell the lands for a profit, or to operate them after being acquired. To this effect the letter contract of July 5th provided:

"This agreement will be considered in force and effect until the 15th day of November, 1912. We will further agree that in the event we decide it is to the best interest of all parties to this agreement to form a corporation with the view of purchasing the lands mentioned above, we will allow you the privilege of bonding the lands to enable us to develop and mine the ore. If you are successful in this undertaking, we will give you 33 per cent. of the corporation's stock after all incumbrances, including our profits, together with your pro rata, are paid on the properties. In the event we should sell either tract of the land by November 15, 1912, or no sale be effected, we will give you the option or right to join us in the purchase of either or both tracts of land at the same rate per acre as we pay, to the extent of 20 per cent. of same."

So the plan or scheme by which the lands were acquired could not begin until after November 15, 1912, when the original agreement of joint adventure was changed. This agreement, as before stated, did not provide when the first adventure should end, no matter what plan should thereafter be pursued in order to promote or consummate the joint adventure. In other words, the agreement of joint adventure only provided when Saunders' exclusive right to sell should terminate. It did not provide when his right to purchase jointly with his coadventurers should cease or terminate. Therefore, unless this original written contract or agreement as to the joint adventure was subsequently abrogated or changed, Saunders had as much right to join in the purchase of January 3, 1913, as he did to join in the purchase under the plan of November 26th, or its subsequent modification. So far as the written agreement of July 5th as to the joint adventure is concerned, Saunders had as much right to join and share with appellants in the purchase of January 3d as he had on November 26th, 27th, or January 2d. Of course, this would not be true if for any reason the original agreement was changed, or was otherwise terminated by the fault or wrongs of Saunders. Such, of course, which were sufficient in law to terminate the joint adventure or enterprise, or to eliminate him therefrom.

It is made to appear from a close scrutiny of all the evidence that the complainant, Saunders, was not a voluntary interloper in the joint adventure, nor does it appear that he obtained his connection with appellants in the joint adventure by any fraud or misrepresentation on his part. He was first solicited by appellants,. or some of them, to join with them in the venture. He accepted their proposition as to the terms of joint adventure. See letter agreement of July 5, 1912. It is evident that his connection with the enterprise was desired because of the fact that he was a promoter of some experience and reputation along the lines of the proposed joint adventure. It was his personal services as a promoter that were desired, and not financial aid. It was known by all the parties during the entire progress of the joint adventure that complainant had very little financial means or commercial credit. It was not financial aid that was desired of him. The aid desired of him was to devise a plan, scheme, ways or means, by which the land in question could be sold at a profit to all the joint adventurers; or (2) by which the land could be purchased by the joint adventurers, and operated as a mining proposition, or resold at a profit, with as little outlay of money as possible. The appellants, or some of them, had for quite a while before complainant was connected with them an option to purchase the lands in question from the owners, and the option continued for quite a while after complainant was connected with them. According to appellants' testimony and theory, they had supplied capital or credit with which to exercise the option to purchase, but did not desire to exercise the option until the land could be tested by drill holes to ascertain the quantity and quality of the iron ore on the land, and therefore its real or market value. Complainant's services were sought, first, to find a buyer who would purchase at a price which would allow a profit to the appellants over and above the option price; and if this could not be done, then the lands were to be purchased by the parties, or by a corporation to be formed by them, and either operated as an ore mine or resold for a profit.

The complainant was given the exclusive right to sell the lands to other parties from the 5th day of July, 1912, to the 15th day of November, 1912; then, and not until then, the complainant was to have an option or right to join with appellants in the purchase of the lands from the owners at the same price which they paid or were to pay, and to the extent of 20 per cent. of the same. We are unable to find, after a careful study of the evidence, that this feature of the letter agreement was ever changed by subsequent agreement, oral or written, or that complainant forfeited his right to join in the purchase which was finally consummated, whether it was consummated on the 2d or 3d of January, 1913.

There is much testimony to the effect that an oral agreement was entered into by and between the parties on or about November 26, 1915, by which complainant agreed to pay to appellants his pro rata share of all past and future expenses of promoting the enterprise, and to pay to Aldrich and Towers, the owners, $31,000, or part thereof, as for certain lands of the corporation to be formed, in order for him to participate in the joint purchase or the contract to purchase of date November 26th, as subsequently amended. We are satisfied from the evidence in this case that complainant originated and devised the plan by which the land was ultimately acquired by appellants, and that they have reaped the benefit of his services in this matter. It is, we hold, certain from the evidence in this case that the written agreement of November 26, 1912, between the joint adventurers on the one part, and Aldrich and Towers, the owners, on the other, was chiefly due to labor and efforts on the part of the complainant. The details of the plan or scheme were, of course, changed from time to time, at the suggestion or request of other parties to the agreement; but to complainant is due the credit of originating the plan and mode by which the lands were acquired from the owners without the necessity of any of the parties to the agreement being required to pay out much money or cash, relatively speaking, of course, considering the value of the lands and the amount involved; the plan being in short to form a corporation, to which the owners should convey the lands, in consideration of bonds and stock of the corporation so formed, the chief capital of which was the land so conveyed, the remaining stock to be divided among the five joint adventurers. It is true that a part of the plan as last amended or changed required that the joint adventurers should purchase from the owners a certain number of the bonds at certain prices. If the bonds, however, were really worth the agreed price, and there seems to be no doubt that they were, this was in fact not an outlay of money for any length of time, as the bonds could readily be resold even to some of the joint adventurers. It is certain that the buying of these bonds, did not in fact, and at the time of sale, was not by the parties thought to involve a loss, but was the mere means of acquiring that much cash, in order to consummate the sale, and to enable the owners to pay an option which they owed for a part of the lands involved in the deal.

The plan by which appellants acquired the lands, as they claim on the 3d day of January, 1913, was but a modified form of the plan devised by complainant, and which was embodied in the written agreement of November 26, 1913. There can be no doubt that Aldrich and Towers breached the contract of November 26th, and that the five joint adventurers had a cause of action against them as for damages, if not for specific performance. It is also quite evident that there was no consideration to support the modification of this agreement which was exacted by Aldrich and Towers for a performance of their contract to convey, as for which they were already paid. It was this first modification which appellants claim complainant breached, and thereby forfeited his further right to participate in the joint adventure. It is likewise evident that the fact that Aldrich and Towers first breached the agreement of November 26th, and the existence of the cause of action against them on account thereof, induced them to agree to the modification thereof, which was finally executed between them and the four appellants. This is shown by the writing itself, in that Aldrich and Towers required appellants to guarantee them against any rights or actions which Saunders might have against them as to any of these agreements and modifications. It is therefore evident that Aldrich and Towers considered that they were under some liability to Saunders by requiring express indemnity against it, and that appellants considered it probable in that they made the express warranty against the liability as a part of the consideration for the purchase which was ultimately consummated. It is true that the evidence is in conflict as to whether or not complainant consented to the modification of the first agreement, which was demanded by Aldrich and Towers. If they all consented to it, there was no consideration to support the modification; and until the agreement as modified was executed, it was not binding on complainant or appellants. Appellants certainly had the benefit of complainant's interest in this cause of action as a part of the consideration for Aldrich and Towers executing the agreement as last modified. It is impossible to know that this did not operate as an inducement or consideration for Aldrich and Towers to execute the agreement as last modified, and when appellants claim that complainant was eliminated from the enterprise it would be wholly inequitable for appellants to reap the benefit of complainant's efforts in originating the plan, and promoting the adven-

ture, and to get the benefit of his interest in the right of action against Aldrich and Towers as for a breach of the agreement of November 26th, and then deny him the right to share in the purchase as finally consummated. Of course, the evidence is in great conflict as to what oral agreements occurred between appellants and appellee after November 15th when his exclusive right to join in the purchase began under the letter agreement of July 5th. It is sufficient here to say that it fails to convince us that there was ever any oral agreement which entirely took the place of or annulled the provisions of the letter agreement, which gave the complainant the right or option to join with appellants in the purchase of this property.

The evidence also fails to satisfy us that complainant ever refused to perform his part of the agreement, so as to forfeit his right to join in the purchase. The most the evidence tends to show is that he failed to get up or secure the necessary amount of money on January 2d with which to pay his pro rata share of the lands which appellants had agreed to buy from Aldrich and Towers, and that on account of such failure the appellants elected to declare the joint adventure with complainant ended, and so notified him, and then on the next day proceeded to purchase the lands on similar terms to those formerly agreed upon, and as to which they concede the complainant theretofore had the right to join with them, provided he paid his pro rata share of the expenses and the purchase price of the lands. This is according to the terms of the letter agreement of July 5th.

[2] While any member of an ordinary partnership may dissolve it at will, and the partnership will exist thereafter only for the purpose of winding up its pending business and affairs, yet in proper cases a court of chancery would restrain or delay the dissolution if it is made to appear that irreparable injury would result from immediate dissolution and sale of the partnership assets. Lindley on Partnership, § 220 et seq. Such dissolution, however, cannot operate to defeat or impair vested or accrued rights. The effect of dissolving a partnership at the will of any one or more of the partners is to throw the winding up of the affairs into a court of equity, unless a different mode of winding up and settlement of the affairs is agreed upon. Stevens v. Yeatman, 19 Md. 480; Lawrence v. Robinson, 4 Colo. 567; Howell v. Harvey, 5 Ark. 270, 39 Am. Dec. 376. Of course, notice to the other partners is necessary to a dissolution by one. The renunciation and dissolution must be in good faith, and not at an unreasonable time.

[3] There seems, however, not to have been any desire or attempt on the part of any of the joint adventurers to dissolve this partnership of joint adventure. The desire and attempt was to continue the joint adventure to consummation, but to exclude complainant from membership in the firm. It is certain that he never attempted to dissolve it or to retire, and the evidence fails to convince us that he was ever guilty of such faults, wrong, or neglect as to forfeit his rights to participate in the joint adventure to the end or consummation thereof. There is, however, no such right in a member, or even a majority of the members, to expel one or more members at will as there is to dissolve the partnership. The two things are entirely different. In the absence of an express agreement to that effect, there exist no right or power of any members, or even a majority of the members, to expel or eliminate all other members from the firm at will. Nor can they at will forfeit the share or interest of a member or members, and compel him or them to quit the firm, even on paying him what is due him. It is not every dereliction of a member, such as a failure to pay his part of the expenses, or to promptly and faithfully perform his part of the services agreed to, which will ipso facto forfeit his right, or even authorize a court of chancery to forfeit his right to the common property or assets of the partnership. There may be, however, extreme and gross faults which would work a forfeiture, especially where there was an extreme emergency for him to perform his part, and to be prompt and faithful. Kimball v. Gearhart, 12 Cal. 27; Piatt v. Oliver, Fed. Cas. No. 11,116, 3 McLean, 27; Gorman v. Russell, 14 Cal. 531.

[4] Courts of equity abhor forfeitures, and will never enforce them unless necessary to enforce the law and to do justice between the parties. It is not every fault, failure, neglect, or dereliction on the part of a member that will justify a dissolution of the partnership, much less an expulsion of a member, as was attempted in this case. This court in an early case of Meaher v. Cox et al., 37 Ala. 202, said:

"While, therefore, it may be true, as said by the chancellor, that the defendants have not committed such acts of misconduct, or been guilty of such willful violation of the terms of the contract, as would authorize the court to decree a dissolution for that cause, yet we think that the combination of circumstances above enumerated does justify a dissolution in this particular case."

[5] No such facts are here shown. If, however, it was found in this case that there was such fault or neglect on the part of complainant on the 2d day of January, 1913, in his failure to raise his share of the $31,000 to be paid to Aldrich, as would justify a dissolution of the partnership, he would nevertheless have been entitled to share in the accrued assets of the partnership or joint adventure, which was in the main, if not in toto, the right of action against Aldrich and Towers as for their breach and refusal to perform the contract of sale of November 26, 1912. This was unquestionably an asset of the firm, and the other partners could not

against his will deprive him of his interest therein after a dissolution of the firm. Even if complainant agreed to the modification of the contract of sale of November 26, 1912, which was demanded by the vendors, Aldrich and Towers, it was utterly void, a mere nudum pactum, without any consideration. It conclusively appears that the change or alteration of the contract was a mere bonus required or demanded by Aldrich and Towers to perform their valid contract as to which they were then required by law to perform. No benefit whatever could or was intended to accrue to complainant or his associates by the change, nor any detriment to Aldrich and Towers. It was purely a bonus to them to perform their part of a valid contract. Such agreements or modifications of existing contracts are absolutely void. When by an amended or modified contract a party does only that which he was theretofore obligated to do by the original contract, he cannot legally demand additional compensation, or other obligations of the other party, as an inducement or reward for performing his part. If the other party promise to pay him more, or to further obligate himself to induce performance of that only as to which the party was originally bound to perform, the promise is a mere nudum pactum, and courts will not lend their aid to enforce such modifications or promises for additional compensation. or further obligations so promised. Such is the well-settled doctrine of this court. Shriner v. Craft, 166 Ala. 146, 51 South. 884, 28 L. R. A. (N. S.) 450, 139 Am. St. Rep. 19.; Montgomery Co. v. Farley Bank, 75 South. 918.[1] In the case of Shriner v. Craft, 166 Ala. 146, 51 South. 884, 28 L. R. A. (N. S.) 450, 139 Am. St. Rep. 19, many, if not all, of the authorities were reviewed on the subject, and the opinion concludes as follows:

"Where the parties agree to rescind the contract, each one gives up the provisions for his benefit, the mutual assent is complete, and the parties are then competent to make any new contract that may suit them. Where one piece of work is substituted for another, the contractor is released from doing one, in consideration that he will do the other. But where one party refuses to do the work, which his contract requires him to do, or even threatens to abandon the work, unless he is paid more, and the other promises to pay more, the original contract still remaining subsisting, we consider it merely a promise to pay for what he was already obliged to do, and a nudum pactum."

The true reason for the doctrine is well stated by the Supreme Court of Minnesota as follows:

"Where the refusal to perform and the promise to pay extra compensation for the performance of the contract are one transaction, and there are no exceptional circumstances making it equitable that an increased compensation should be demanded and paid, no amount of astute reasoning can change the plain fact that the party who refuses to perform, and thereby coerces a promise from the other party to the contract to pay him an increased compensation for doing that which he is legally bound to do, takes an unjustifiable advantage of the necessities of the other party. * * * Surely it would be a travesty on justice to hold that the parties so making the promise for extra pay were estopped from asserting that the promise was without consideration. A party cannot lay the foundation of an estoppel by his own wrong," where the promise is simply a repetition of a subsisting legal promise. "There can be no consideration for the promise of the other party, · and there is no warrant for inferring that the parties have voluntarily rescinded or modified their contract. * * * The promise cannot be legally enforced, although the other party has completed his contract in reliance upon it." King v. Railroad Co., 61 Minn. 482, 63 N. W. 1205; Scott v. Rawls, 159 Ala. 399, 48 South. 710; Alaska Packers' Ass'n v. Domenico, 117 Fed. 99, 54 C. C. A. 485 (C. C. of App. Ninth Circuit 1910); Davis & Co. v. Morgan, 117 Ga. 504, 43 S. E. 732, 61 L. R. A. 148, 97 Am. St. Rep. 171 (1903); Esterly Machine Co. v. Pringle, 41 Neb. 265, 59 N. W. 804 (1894).

The evidence conclusively shows that neither the complainant nor his coadventurers were legally bound to perform the contract of November 26, 1912, as modified, either by the first or second modification, that is, the one as to which appellants claim appellee breached, or the one which appellants performed on the 3d day of January, 1913. The performance by appellants of the contract as modified on the day of its performance was a gratuitous submission on their part to Aldrich's unlawful demand. It was in effect coercion on Aldrich's part. The record clearly shows that it was only submitted to because it was necessary to consummate the joint adventure, and the majority of the adventurers preferred to comply with Aldrich's demand, rather than fail to acquire the lands, and be remitted to their action against Aldrich as for a breach of his contract.

We cannot know that complainant would not also have submitted if he had been given the opportunity so to do. The appellants, however, preferred to indemnify Aldrich against any claim that appellee should have, rather than to allow appellee to join with them, as he had a right to do. He had as much right to join in the second modification of the agreement with Aldrich as he did in the first. The fact, if it be a fact, that he failed to perform his part of the modification which was void did not preclude him from the right to join in the second modification, which was executed as modified. If the agreement of the joint adventure between appellants and appellee had been limited solely to the agreement with Aldrich and Towers of November 26th as first modified, if this was all the agreement ever had between appellants and appellee, and his agreement was to pay his pro rata share of the $31,000 on the 2d day of January in order to share in the purchase or joint adventure, and he had failed to so perform his part, then, of course, the agreement would have been at an end, so far as complainant was concerned, and appellants would have been free to have made another and different or even the same con-

[1] 200 Ala. 170.

tract with Aldrich on the 3d day of January, or any later date, and appellee would have had no right to join or participate or to complain of their action. We have shown, however, that such was not the fact. The November 26th contract, as first amended or modified, was not the sole agreement of joint adventure between appellants and appellee. In fact it was not the agreement between the parties at all. It was only an agreement between the joint adventurers, acting jointly on the one part, and Aldrich and Towers on the other part. It did not purport to be an agreement between appellants and appellee as to any rights or duties of one to the other, but only their rights and duties jointly towards Aldrich and Towers, and the latter's rights and duties toward the joint adventurers. We do not mean to say that this is directly insisted upon by appellants, but they do insist that there was a parol agreement between appellants and appellee which limited complainant's rights exclusively to a prompt and specific performance of his part of this contract with Aldrich and Towers, and that this was the only agreement of joint adventure existing between them, and that it expired by its terms on the 2d day of January, 1913. The evidence fails to satisfy us of any such oral or written agreement between appellants and appellee, or that such contract, if made, was the only and sole agreement of joint adventure between them.

The basic facts of the joint adventure agreement are contained in the letter agreement of July 5th. Of course, it could be, and was in fact, changed by subsequent oral agreements in the progress of the joint adventure; but we find no evidence which convinces us that it was ever so changed by a new or oral agreement such as to limit all of complainant's rights to share in the joint adventure to a strict compliance on his part of the November 26th contract with Aldrich and Towers, as first modified, or that all of his rights to join in the purchase with appellants terminated on the 2d day of January. The basic errors or faults we find in appellants' contentions may be briefly stated or summarized as follows: First, in the supposition or conception that all of complainant's rights under the letter agreement of July 5th ended or terminated on November 15, 1912. Second, that there was a valid oral agreement among all the joint adventurers that complainant's right to join in the purchase was limited to January 2, 1913, and that if a purchase was not effected by that date, that all of his rights to join with appellants in the purchase ceased to exist. While we find some parts of the evidence of some of the appellants tend to show the existence of such an oral agreement, considering all of the evidence as a whole, it fails to convince us of the existence of any such oral agreement to that effect. Third, in treating the contract or

agreement between all the joint adventurers on the one part, and of Aldrich and Towers on the other part, of November 26th, as first modified, as being the sole agreement of joint adventure between appellants and appellee. This was not the object or purpose of the original agreement of this date, or of the agreement as first amended. The expiration of this agreement did not per se terminate or end the partnership or joint adventure between appellants. The expiration of this agreement or contract may have ended or rendered impracticable the acquisition of the lands or the perfection of the joint adventure by that plan, mode, or scheme, but it did not terminate the partnership between the joint adventurers for acquiring the lands by some other mode, plan, or terms. The rights of none of the joint adventurers as between themselves as partners of the joint adventure were by virtue of that agreement between them and Aldrich and Towers ended or terminated. If that plan or mode failed on account of the fault of one of the joint adventurers, the one so failing might be liable to the partnership, or to the other members as for losses sustained on account of his fault or neglect in failing to consummate the agreement with Aldrich and Towers; but as we have before said, this alone did not dissolve the partnership or afford ground for the expulsion or exclusion of the member in fault from further participating in the partnership or joint adventure in the absence of any agreement to this effect, and we have found no evidence which satisfies us that there was such an agreement either in writing or parol. Thus we held on the former appeal, when it was said:

"In this view of the case, the expiry of the Aldrich and Towers contract by express limitation on January 1 or 2, 1913, would not of itself terminate the agreement of joint adventure made between complainant and his associates on October 26, 1912. That agreement was not limited as to its duration. It was therefore not terminable at the pleasure of any of the parties, so long as its purpose remained unaccomplished, and had not become impracticable. Berry v. Colborn, supra [65 W. Va. 493, 64 S. E. 636], 17 Ann. Cas. 1022, note; Jones v. Kinney, supra [146 Wis. 130, 131 N. W. 339] Ann. Cas. 1912C, 202, note; 23 Cyc. 454, E."

While the former appeal was on the pleadings only, and there has been some change in the pleadings, yet neither the changes in the pleading, nor the evidence alters this rule as before declared. It was further said on the former appeal:

"It is, we think, a sound rule of equity, if not law also, that if one of the parties, after the accomplishment of the enterprise, fails or refuses, upon reasonable notice and demand by his associates, to contribute his due proportion to the expenses thereof, he cannot invoke the aid of a court to secure a share of the proceeds. See Lind v. Webber, 36 Nev. 623, 134 Pac. 461, 135 Pac. 139, 141 Pac. 458, 50 L. R. A. (N. S.) 1046 [Ann. Cas. 1916A, 1202]. But the mere fact that some of the parties paid all the expenses, or furnished all the money used, does not exclude nonparticipating associates from a

share of the proceeds. Botsford v. Van Riper, 33 Nev. 191, 110 Pac. 705; Lind v. Webber, 36 Neb. 623, 134 Pac. 461, 135 Pac. 139, 141 Pac. 458, 50 L. R. A. (N. S.) 1046 [Ann. Cas. 1916A, 1202]."

The amended pleadings and evidence make this principle apt on this appeal: That a party who seeks to enforce a contract or to share in the proceeds of it must aver and prove either that he has performed in full his part of the contract in accordance with the terms of the contract, or else that he stood ready, able, and willing to so perform his part, and was prevented from so doing by the fault of the other party. This principle is not applicable to obligations or matters arising out of partnership or quasi partnership affairs. It was thus said that, as between the partners as to partnership affairs:

"It cannot be justly applied, and we believe it has never been applied, to obligations arising out of partnerships or quasi partnerships, which are founded upon trust and confidence, and which, without some express stipulation, are not presumed to exact, as conditions precedent to the continuance of the relation and the enjoyment of its fruits, the prompt and equal discharge, or readiness to discharge, by each partner or associate, of his various obligations concurrently with the occasion. For his defaults of duty a partner may be taxed with the loss he inflicts upon the business; and in grave cases the partnership may be dissolved by judicial decree; but it is not dissolved ipso facto." 191 Ala. 136, 67 South. 596.

[6] We hold that the evidence in this case fails to show such grave fault on the part of appellee which would authorize a dissolution of the partnership or the expulsion of the appellee from further membership or participation in the joint adventure as was attempted by appellants in this case.

It is unnecessary for us to discuss the effect of the note given by appellee to appellants for $12,500 further than to say that it, in connection with all the oral and written proof, shows that appellee originated the plan of November 26, 1912, by which plan, as subsequently modified, the lands were ultimately acquired. If it was not given for the purpose of taking care of and providing for appellee's share of the expenses in promoting and consummating the joint adventure, it is difficult to ascertain for what purpose it was given. It is true that there is some evidence tending to show that it was given to induce Shannon to abandon the option of November 8th, and join with the other adventurers in the plan of November 26th, or to compensate him individually for the losses he would sustain, ·by accepting the plan of November 26th, rather than enforcing or exercising the option of November 8th, to purchase at a given price. The written evidence in the record, the note itself, and the documentary evidence attached thereto, together with much oral testimony, render it impossible for us to find that it was not intended to provide in part at least, if not in whole, for appellee's part of the expense in promoting the joint adventure,

under the plan of November 26, 1912. It may be that it was the complaints of Shannon that led to the execution of the note; but the note itself as well as other evidence shows that its consideration was not merely to compensate Shannon, as for individual losses which he would sustain by accepting the proposed plan of November 26, 1912. We are therefore strongly persuaded that the true consideration of this note was to provide for appellee's part of the expenses in promoting and effectuating the plan of November 26th, which was evidently originated by him, and as modified to meet the demands of Aldrich, the vendor, was finally consummated on January 3, 1913.

We would serve no good purpose to further discuss the law or evidence of this case, or treat severally any of the assignments of error on the direct or cross appeal. Suffice it to say, we find no reversible error in the decree of the chancellor, and it is in all things affirmed.

Affirmed.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.

On Application for Rehearing.

MAYFIELD, J. [7] On a rehearing we have reached the conclusion that complainant, Saunders, is entitled to a decree jointly and severally against each of his coadventurers, and to this extent only is the decree of the chancellor erroneous; and to this extent it will be here corrected, and, as corrected, affirmed.