[No. 30543. Department Two. June 2, 1949.]

SAM MACRI *et·al., Appellants,* v. BAY CONSTRUCTION
COMPANY, INC., *Respondent.*[1]

*Granville Egan,* for appellants.

*Ferguson, Burdell & Armstrong,* for respondent.

ROBINSON, J.—This is an action for an accounting brought
by Macri and Company against the Bay Construction Com-
pany on a contract of joint adventure entered into by both
the parties. The trial court dismissed the action, and plain-
tiffs appeal.

The facts are greatly in conflict, but may be summarized
as follows: On August 4, 1944, respondent, Bay Construc-
tion Company, entered into a contract with the United

[1]Reported·in 206 P. (2d) 797.

States of America, acting through the war department, for the construction of additional railroad trackage and facilities at the Tulalip Ammunition Back-Up Storage Depot at Tulalip, Washington. Preliminary work began during the month of August. On September 1, respondent and appellants entered into the joint venture agreement here in issue, respondent acting through H. K. Wasson, its president, and appellants through Don Macri, a copartner in the firm of Macri and Company. The material parts of the contract are as follows:

"JOINT VENTURE AGREEMENT

"THIS AGREEMENT made this first day of September, 1944, by and between BAY CONSTRUCTION, INC., a corporation, of Seattle, Washington, and MACRI & Co., a co-partnership, of Seattle, Washington,

"WITNESSETH:

"WHEREAS the first party did, on the 14th day of August, 1944, enter into a contract with the United States Army, being contract W-45-108 eng-1031, and,

"WHEREAS the first and second parties have agreed to jointly share in the profits and losses of said work as hereinafter more fully defined;

"Now, THEREFORE, it is hereby agreed as follows:

"*That the parties hereto shall share equally in the capital contributions and shall each, upon determination by first party of the amount of capital required for the work contemplated in said contract, pay their share of the original capital contribution or any subsequent capital contribution deemed necessary, forthwith.*

"That the first party shall have the sole supervision of the work contemplated by said contract, together with all additions or extras which may be required and the second party shall have the right to inspect at regular intervals, preferably monthly, all books and records showing receipts and disbursements on said construction project and any portion or portions of the work theretofore completed or in progress. . . .

"That the first and second parties shall equally share in all profits or losses which may arise from said contract. 'Profits' as used herein shall be defined to mean the amount of money collected from said contract, less all sums paid out for labor, materials, equipment or machinery rentals, monies paid in consideration of said contract, overhead, five

per cent (5%) of profits for job superintendent, and all other necessary or incidental expense. All overhead shall be paid to the first party and shall be in an amount equal to ten and seven tenths per cent (10.7%) of the amount of said contract including any additions, modifications and extras. . . .

"*The first party shall have the sole charge of the finances of the job and shall make a monthly statement showing the estimated profits or losses on said job.* . . .

"Upon final payment of the contract price by the United States Army, the first party agrees to make up a statement showing the net profit from the job and will thereupon forthwith pay to second party their share, if any, of said profits; likewise in the event of a loss, first party will make a similar statement showing the loss and second party will forthwith remit to first party their share of the loss.

"This agreement shall include the aforesaid contract only and shall terminate upon completion and final payment thereof. No party hereto may obligate the other party on any other work or under any other contract unless said work or contract is necessary or incidental to the performance of this contract.

"This agreement constitutes the entire agreement between the parties and all previous oral agreements are superseded and merged herein. (Italics ours.)

"IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first above written.

"BAY CONSTRUCTION, INC.

"By H. K. Wasson, President

"MACRI & CO.

"By Don Macri, Partner"

In accordance with the terms of the agreement, respondent continued to direct the operation of the project. Very shortly, however, the subsurface soil in the project area was discovered to be extremely wet and sandy. This led to unanticipated construction difficulties, and a serious disagreement arose between respondent and the army over the proper method of continuing the work. Respondent attempted to carry out the project in accordance with the army specifications, but requested that, in consequence, the contract price be increased. Because of this (in respondent's view) and in any case because it was not satisfied

with the results being reached, the army held up estimates and payments to respondent. Finally, the breach became so serious that the army cancelled respondent's contract and ordered Wasson off the premises. On November 30th, respondent wrote Macri and Company informing it of the situation. The letter contained the following paragraph:

"The Army has held up the October estimate and we do not know whether they intend to pay it now or withhold it. We are also inclined to believe that they will hold the November estimate. As soon as we can determine what they intend to do on the October estimate we will get out a financial statement for you to date so that you will know where we stand on this job and we can then determine the amount of your capital contribution."

Both Don Macri and his father, Sam Macri, another co-partner in the firm of Macri and Company, testified that, prior to this time, there had never been any demand made on Macri and Company for a capital contribution; that, in fact, sometime in September, shortly after work on the job had started, Sam had inquired if respondent needed any assistance and had been told by Wasson that the job was carrying itself. Wasson, however, testified that, at the time the joint venture agreement was entered into, it was the explicit understanding between the parties that the amount of the capital contribution required of each of them would probably amount to about thirty thousand dollars. Wasson further testified that, sometime in October, he spoke to Don Macri and "asked him about putting up his money."

"Q. What did he say? A. He said they would have to borrow the money from the bank and he would drop down and see me later about it. Q. Did he drop down? A. No. Q. Did he put up any money? A. No, he didn't."

Meanwhile, Don Macri testified that, in October, he had written a letter to respondent requesting a report on the costs and progress of the work. Although Macri explicitly stated that he recalled mailing this letter, Wasson, as well as his brother who was associated with him in the respondent company, and a stenographer employed by them at the

time, all testified that, to their knowledge, it had never been received.

By agreement with respondent, the job was taken over early in December by the United Pacific Insurance Company, which, as surety for respondent, had executed a performance bond at the time of the original contract between respondent and the army. Wasson again wrote Macri and Company, requesting its approval of the contract entered into between respondent and the bonding company, and its authorization of any expense which respondent might incur to the surety thereunder. Don Macri replied, giving the approval and authorization requested. He testified that, prior to the signing of this agreement, he had been requested by respondent, or its attorney, to submit a statement showing the financial condition of Macri and Company, in order that the bonding company might inspect it before entering into the agreement. He testified that he complied with this request, and this testimony was not denied by respondent. The work continued, under the nominal supervision of the bonding company. However, Wasson was soon permitted to return to the project, and respondent again took over actual, if not nominal, control. The work was eventually carried out according to the procedure originally recommended by Wasson. Because of the changed conditions, however, the total cost of the project was greater than had been anticipated, and respondent had corresponding claims against the government.

Sometime in December, according to the testimony of Wasson, a meeting between himself and Sam Macri took place at the Washington Athletic Club. Wasson testified concerning this meeting as follows:

"Q. Tell the substance of your conversation with Sam Macri, at that time, at the Athletic Club? A. Well, I told him of the condition of the job and that we had hired an attorney and I gave him the facts of the situation from one end to the other and that I thought we had a right for a claim from the job, etc. He agreed with me and thought we were in the right. Then . . . he said . . . 'I think . . . we better go to Washington, D. C. with it'; that he knew somebody there, and I said I didn't. He was

all for doing that. I asked about putting up some money on this job because if we were going into this thing this way we would need it. He was very evasive. He didn't come out and say he would put up anything. After that conversation, at that time, I told him we had all our cash practically in the job now and we were going to have to get help or borrow money some place. Q. About how much cash did you have in the job at that time? A. Well, I would say we had between eighty and ninety thousand dollars."

Sam Macri responded to questioning concerning this alleged meeting in the following manner:

"Q. And is it not a fact you did meet with Mr. Wasson at the Washington Athletic Club when Sam Beresed was there? A. I don't recall. Q. Would you say it didn't happen? A. I don't recall it. I have remember, like he say, I call and make an appointment which I don't remember no such thing. Q. I believe Mr. Wasson said he called your office and wanted to meet you and you said you would meet him at the Washington Athletic Club. A. Well, I had an office. His office and mine were close and I surely would not take him way up to Pike Street to meet him. THE COURT: You don't recall whether you and Sam Beresed and Mr. Wasson were there? A. I don't recall."

Don Macri testified that, during this period, he frequently asked Wasson for a profit and loss statement, but that none was ever received. He stated that, on January 10th, he wrote respondent another letter, requesting return of the financial statement he had submitted for the benefit of the bonding company, and containing the following paragraph:

"At your earliest convenience we would also like a report on the progress and financial condition of this job as we have never received any to date."

Again, Macri testified that he had personally mailed this letter; but again, Wasson, his brother, and the stenographer employed by respondent testified that respondent had not received it. Wasson denied that he had ever been asked for a profit and loss statement. He testified, at considerable length, as to the reasons for respondent's not having furnished Macri and Company with such statements monthly, a duty which was, of course, imposed on respondent by the

contract. The general effect of this testimony was that, in consequence of the continuing disagreement between respondent and the army over the amount of money actually due the former, it would have been impossible, or at least very difficult, to have made up a profit and loss statement which was in any degree accurate. Wasson stated that the circumstances giving rise to this situation were discussed many times with Macri and Company.

Don Macri testified that, early in January, he and his father met with Wasson and his brother in respondent's office and that at this meeting Sam Macri asked if any financial assistance was needed. According to Don, Wasson replied that the job was carrying itself. Sam Macri did not testify specifically as to any meeting held at this time, but, from his testimony as a whole, it is possible to infer that this meeting was either the same as that which Sam stated he had attended earlier in the fall or the same as that which he subsequently asserted he attended on April 9th. In any case, Wasson denied, on the stand, that the job ever carried itself; and he further stated that he kept the Macris informed of the true financial situation of the project at all times.

Wasson had his own version of a meeting which he alleged was held early in January with Don Macri. He stated that at that time the following occurred:

"A. Well, along the first of January we were not getting our estimates in fast enough to take care of what we were spending, so I talked to Don Macri again around the first of January and told him we were going to have to borrow money from the bank and if he would make a contribution of his capital, and I told him how much money we had in it. In fact, he was down in the office previously to that talking about the job. Q. Did you tell him how much money you had in the job? A. I told him in January we had practically a hundred thousand and would have to borrow money to meet the bills on the 10th of January. . . . Q. During this conversation you had with Don Macri, just prior to making this loan, did Don Macri offer to put up any money? A. Well, he said that they would have to borrow money again and he would drop down and see me and he never did come down or offer to contribute anything to the job."

On January 17th, respondent, acting through an associated company, borrowed sixty thousand dollars on a ninety-day note, and testimony was given to the effect that this money was employed in connection with the Tulalip project.

Sam Macri testified as to still another meeting which, he alleged, took place in Wasson's office sometime around April 9th. On this occasion, he testified that, in response to his request for a profit and loss statement on the job, Wasson produced a progress report, apparently of a complicated nature, which Macri said "would take an expert to look at it." His testimony was to the effect that he did not understand this document, and was not satisfied with it. Wasson denied that this meeting took place in April, but testified that on one occasion he had shown Macri the progress report which, as he stated, was a day-by-day record kept by respondent's engineer. He stated that he used this report to aid in explaining the financial situation of the project to Macri.

On April 11th, Wasson wrote a letter to Macri and Company, which was sent to it by registered mail. Unlike much of the other correspondence involved in this case, all parties agree that this letter was actually mailed and that it was received by the addressee. The letter is of considerable importance in the case, and we quote it in full:

"Macri & Company April 11, 1945
"905 10th South
"Seattle, Washington
"Gentlemen: —

"We have many times requested you to put up your share of the capital contribution under the Joint Venture Agreement dated September 1, 1944. To date we have not received any capital contribution from you in compliance with these requests. As you no doubt recall, the contract provides that you will 'pay your share of the original capital contribution or any subsequent contribution deemed necessary, forthwith.'

"At the present writing we have over $100,000.00 in this job and it is necessary for us to meet a note in the sum of $60,000.00 on April 17th. Under the circumstances it is imperative that we have your capital contribution in a sum not less than $50,000.00 forthwith in accordance with the contract. Unless this money is forthcoming by April 16th

we will assume that you intend to make no capital contribution and have forfeited your rights under this contract.

"Very truly yours,
"BAY CONSTRUCTION, INC.
"By H. K. Wasson, President."

As to what occurred upon receipt of this letter by appellants, we have three different versions, which are in agreement on only one point: Macri and Company did not contribute the money. Sam Macri testified that he was in the office when the letter arrived; that he turned it over to Don; and that Don telephoned respondent in his presence "a couple of times" right after the letter was received. Don did not testify concerning the telephone calls. He stated, however, that he immediately wrote, and personally mailed, a reply to respondent, reading, in part, as follows:

"Bay Construction Co. Inc., April 14, 1945
"1762 Airport Way
"Seattle 4, Washington.
"Gentlemen:
"I acknowledge your letter of April 11, 1945, and frankly cannot understand the purport of it. My father and I were at your office only a day or so ago, as you must recall, discussing various means and methods of the best way to pursue our claims with the government in regard to the cancellation of the contract by them. It strikes me as very strange that you did not bring up the matter to which you refer in your letter of April 11, 1945, at that time.
". . . However, . . . you may be assured that as soon as you render available to us job costs, records and reports to date, which we have continuously asked for and never seen or received and which incidentally you were supposed to furnish monthly in accordance with the executed agreement, we will examine same and if it is necessary we will immediately contribute our share of any needed capital. . . .

"Yours very truly,
"MACRI & COMPANY
"By_____
"Don Macri, Partner"

Don Macri testified that respondent's letter was the first demand, oral or written, that he had ever received for a

capital contribution from respondent. He stated that he received no reply to his answer, but that he later discussed the letter with Wasson, who told him that he, Wasson, "was trying to settle the claims and when he was through he would let me know." Wasson, however, denied receiving any telephone calls in response to his letter of April 11th; and he, his brother, and their secretary denied that any letter, such as that claimed to have been written by Don Macri, was ever received by respondent. Wasson testified, however, that the day after he had mailed the letter, Sam Macri came to his office, and the following conversation took place:

"A. Well, he said he received the letter and wondered what to do about it. I said 'Well, I think you should put in your money.' He said 'Well, how is the job coming?' I said 'We are starting to negotiate on the settlement of this job.' He said 'Well, I don't think you are doing it right. You should go to Washington.' At that time I explained to him if he wanted to go to Washington and spend a lot of money and hire a lot of attorneys, etc., I was not going to do it on my money. I said 'I have got everything I have got on this job,' and that if he wanted to get in on the negotiations and settling he was welcome if he wanted to put his money in and assist in it. That is the way I left it, that I was going to negotiate the best I could to get my money out and if he thought he could help me to put his money in. Q. Did he offer any assistance at that time? A. He was evasive about it. He said 'I will see what we can do.' Q. Did you hear from him any further? A. No, I have not heard from him since. Q. Did you hear from Don Macri? A. No. Q. Following that meeting with Sam Macri did you have any conversation with any representative of the plaintiff about putting in any money? A. After that meeting? Q. Yes. A. No, sir."

In the latter part of May, the army indicated that they would settle the disputed claims with Wasson, and the job itself was completed on May 31st. Don Macri asserted that he had numerous conversations with Wasson during the period from April 11th to August 26th:

"Q. Would you say how often you talked to him? A. Well, I would call him every three or four weeks. I wanted to

find when I could get things settled up. He kept telling me they were trying to settle the claims and when they were settled he would immediately call me up. Q. Did he call your attention to his letter of April 14th and tell you you had forfeited all rights? A. He certainly did not. Q. Was that letter ever mentioned by him? A. No, I don't believe it was."

Don Macri further alleged that, on August 31, 1945, he personally mailed a letter to respondent, accusing it of having settled and demanding an accounting; and that, on September 26th, he followed this up with another letter, threatening suit unless a complete accounting should be made. Again, however, receipt of these letters was denied, and Wasson testified that he had had no conversations at all with Don Macri after April 11th, when he sent the letter demanding a capital contribution.

Although we do not find the testimony of either party completely convincing, that of respondent appears, on the whole, to be more in accord with the portion of the evidence which is undisputed. This was apparently the view of the court below; and, while the supreme court is not absolutely bound by the trial court's findings on disputed evidence, in a proceeding for an accounting between joint adventurers, great weight should be given thereto. *Wiegardt v. Becken,* 21 Wn. (2d) 59, 149 P. (2d) 929.

In any case, the one fact which stands out clear and undisputed from the rest of the testimony, is that, when appellants were requested to perform the only duty required of them in the furtherance of the joint adventure, to wit, their contribution of capital, they failed to do so. They contend that they were entitled to a profit and loss statement before making such a contribution, and that the submission of such statements monthly was a necessary condition of the contract which respondent failed to perform. The testimony of Wasson was to the effect that, as a result of continuing disputes with the army as to how much money was actually owing respondent, the making of a satisfactory profit and loss statement at any given time would have been impossible. But whether or not this is true, there is noth-

ing to indicate that the submission of such a statement was a condition precedent to appellants' obligation to make a capital contribution. The two matters are dealt with in entirely separate sections of the contract and do not appear to be related. More significantly, it is unequivocally stated in the contract that, upon determination by respondent of the amount of capital required, appellants should thereupon pay their share thereof *forthwith*.

Furthermore, the lack of profit and loss statements did not leave appellants uninformed, or at least should not have done so. In its letter of November 30th, respondent seems to infer that its normal procedure, before requesting a capital contribution, would be the preparation of a profit and loss statement for submission to the appellants. However, that same letter clearly indicates that the only reason why such a statement had not yet been prepared was the army's holding up of the October estimates. Although these estimates were later paid, disputes with the army over claims continued until May, and were still unsettled at the time respondent made its written demand for a capital contribution. All the evidence shows that appellants were in constant touch with respondent throughout this period, and that they must have been well aware of this situation. It further indicates that all of the information which could have been placed on a profit and loss statement was available to appellants on respondent's books, and that appellants never made an attempt to examine these books. There is nothing to suggest that respondent ever made any effort to conceal the financial situation of the project from appellants, even at the time the army cancelled its contract, when a possible loss was in the offing and the outlook for all concerned was very bleak. Considering the entire situation, we are not of the opinion that submission of a profit and loss statement was a necessary condition precedent to appellants' obligation to perform their part of the contract.

 At the time the bonding company took over the project, appellants submitted a statement of their financial condition for examination by the company. This may have been done, as the appellants urge, to bolster respondent's

credit with the company. However, no evidence was presented to show what effect, if any, the furnishing of this statement actually had on the company's subsequent conduct. In any case, the submission of such a statement was not related to any provision in the contract. Aside from the furnishing of this statement, and except for a few visits which Don Macri claims to have made to the project, appellants contributed absolutely nothing toward the furtherance of the joint venture. Respondent carried through the entire project alone. Under such circumstances, appellants are not entitled to an accounting. *Sly v. Abbott,* 89 Cal. App. 209, 264 Pac. 507; *Dike v. Martin,* 85 Okla. 103, 204 Pac. 1106; *First Nat. Bank v. Rush* (Tex. Comm. App.), 210 S. W. 521; 30 Am. Jur. 690, § 28. *McDonough v. Saunders,* 201 Ala. 321, 78 So. 160, 11 A. L. R. 419, cited by appellants to support their contention, is distinguishable on its facts. The comment immediately following it in A. L. R. covers the situation here involved and states the applicable law.

■ One more point remains to be considered. Appellants strenuously denied that any demand for a capital contribution was made on them prior to the written demand of April 11th. However, they argue in their brief that, if any such demands were made, respondent should have declared a forfeiture immediately, upon appellants' refusal to comply with them. They contend that respondent failed to do this because, at least at the time when the final oral demand was made, respondent was facing a loss and wished to continue to hold appellants liable under the joint venture agreement. Respondent not having elected to declare appellants' interest forfeit on these occasions, appellants contend it waived its right to do so subsequently.

The evidence, however, does not show that appellants ever made a downright refusal to make a capital contribution; rather, it indicates that, when approached on the subject, they were evasive, intimating that they would prefer to discuss the matter at some later time. Had they flatly stated that they would refuse to make any capital contribution whatever, and had respondent nevertheless chosen to hold them liable under the agreement, we would perhaps

be presented with a different situation. However, the inference here is that appellants were no more anxious for a complete breach on these occasions than was respondent. Apparently, they preferred to be cautious and await developments. Nothing they said or did indicated that they did not eventually intend to fulfill their contractual obligations. Consequently, there is no valid basis for the contention that, prior to its written demand, respondent had waived any of its rights in electing to treat the contract as still in force.

The judgment of the trial court is affirmed.

SIMPSON, MALLERY, SCHWELLENBACH, and HILL, JJ., concur.